# 23-1147

In The

# United States Court Of Appeals
## For The Second Circuit

## MICHAEL SALAZAR,
**individually and on behalf of all others similarly situated,**

*Plaintiff-Appellant,*

v.

## NATIONAL BASKETBALL ASSOCIATION,

*Defendant-Appellee.*

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK (NEW YORK CITY)
The Honorable Jennifer Louise Rochon, U.S. District Judge
NO. 0208-1 : 22-CV-7935

———————

## BRIEF OF APPELLANT

———————

Joshua I. Hammack
Michael L. Murphy
BAILEY & GLASSER, LLP
1055 Thomas Jefferson
Street, NW
Suite 540
Washington, DC 20007
(202) 463-2101

*Counsel for Appellant*

## TABLE OF CONTENTS

**Page:**

TABLE OF AUTHORITIES.........................................................................iii

JURISDICTIONAL STATEMENT .........................................................1

STATEMENT OF THE ISSUES ............................................................1

INTRODUCTION .................................................................................2

STATEMENT OF THE CASE.................................................................4

    The Complaint ...............................................................................4

    The NBA's Motion to Dismiss.......................................................7

    The District Court's Opinion ........................................................9

SUMMARY OF THE ARGUMENT ....................................................12

STANDARD OF REVIEW .................................................................15

ARGUMENT .....................................................................................16

    I.    Mr. Salazar Is a "Subscriber of Goods or Services from a Video Tape Service Provider.".................................................18

        A.    The broad statutory phrase "goods or services" plainly includes the NBA's online newsletter .......................................20

        B.    In holding that Mr. Salazar was not a "consumer," the district court improperly narrowed the statute's unambiguous language.............................................................26

        C.    Even if the term "goods or services" were intended to mean only audio-visual goods or services, the NBA's newsletter would qualify.............................................................31

i

D.    The court compounded these legal errors by denying Mr. Salazar leave to amend ........................................................ 33

E.    The district court's analysis overlooks the statutory correlation between "subscriber" in Section 2710(a)(1) and "delivery" in Section 2710(a)(4) ........................................ 35

II.    The NBA's Other Arguments Below Do Not Alter These Conclusions ........................................................................................ 37

A.    Mr. Salazar suffered a concrete injury-in-fact based on the disclosure of his private information ................................... 38

B.    The district court should address the NBA's remaining arguments in the first instance on remand ................................ 40

CONCLUSION ................................................................................................ 41

CERTIFICATE OF COMPLIANCE WITH RULE 32(a) ........................................ 42

CERTIFICATE OF FILING AND SERVICE ........................................................... 43

# TABLE OF AUTHORITIES

**Page(s):**

**Cases:**

*Alex v. NFL Enterprises LLC*,
No. 1:22-cv-09239, 2023 WL 6294260 (S.D.N.Y. Sept. 27, 2023) ..............11

*Ark. Tchr. Ret. Sys. v. Goldman Sachs Grp., Inc.*,
11 F.4th 138 (2d Cir. 2021)...........................................................................40

*Auburn Hous. Auth. v. Martinez*,
277 F.3d 138 (2d Cir. 2002).........................................................................16

*Barnhart v. Sigmon Coal Co.*,
534 U.S. 438 (2002).................................................................................18, 25

*BedRoc Ltd., LLC v. United States*,
541 U.S. 176 (2004)............................................................................*passim*

*Bensch v. Estate of Umar*,
2 F.4th 70 (2d Cir. 2021)..............................................................................16

*Buechler v. Gannett Co., Inc.*,
No. CV 22-1464, 2023 WL 6389447 (D. Del. Oct. 2, 2023) .......................22

*Carroll v. Gen. Mills, Inc.*,
No. CV231746, 2023 WL 6373868 (C.D. Cal. Sept. 1, 2023).....................11

*Carter v. Scripps Networks, LLC*,
--- F.Supp.3d ---, No. 22-cv-02031, 2023 WL 3061858
(S.D.N.Y. Apr. 24, 2023) ....................................................................*passim*

*City of Pontiac Gen. Emps.' Ret. Sys. v. MBIA, Inc.*,
637 F.3d 169 (2d Cir. 2011).........................................................................15

*Cruz-Miguel v. Holder*,
650 F.3d 189 (2d Cir. 2011).........................................................................25

*Ct. Nat'l Bank v. Germain*,
503 U.S. 249 (1992).................................................................................19, 24

*DiPierre v. U.S.*,
    564 U.S. 70 (2011) ........................................................................24

*Ellis v. Cartoon Network, Inc.*,
    803 F.3d 1251 (11th Cir. 2015) ...................................................17

*El Omari v. Int'l Crim. Police Org.*,
    35 F.4th 83 (2d Cir. 2022) ...........................................................21

*Faehner v. Webcollex, LLC*,
    No. 21-1734, 2022 WL 5000454 (2d Cir. Feb. 18, 2022) ...........38

*Fisher v. Aetna Life Ins. Co.*,
    32 F.4th 124 (2d Cir. 2022) .........................................................15

*Foman v. Davis*,
    371 U.S. 178 (1962) ................................................................33, 34

*Gardener v. MeTV*,
    No. 22 CV 5963, 2023 WL 4365901 (N.D. Ill. July 6, 2023) ......11

*Golden v. NBCUniversal Media, LLC*,
    No. 22 CIV 9858, 2023 WL 5434378 (S.D.N.Y. Aug. 23, 2023) ...............11

*Harris v. Pub. Broad. Serv.*,
    No. 1:22-cv-2456, 2023 WL 2583118 (N.D. Ga. Mar. 20, 2023) ...............27

*Henson v. Santander Consumer USA Inc.*,
    582 U.S. 79 (2017) ................................................................24, 25

*Jama v. Immigration & Customs Enf't*,
    543 U.S. 335 (2005) ......................................................................23

*King v. Burwell*,
    576 U.S. 473 (2015) ......................................................................35

*Lamb v. Forbes Media LLC*,
    No. 22-cv-06319, 2023 WL 6318033 (S.D.N.Y. Sept. 28, 2023) ...............11

*Lamie v. U.S. Trustee*,
    540 U.S. 526 (2004) ................................................................19, 22

*Lebakken v. WebMD, LLC*,
    640 F. Supp. 3d 1335 (N.D. Ga. 2022) ......................................... 22

*Markels v. AARP*,
    No. 4:22-cv-5499, 2023 WL 6411720 (N.D. Cal. Aug. 29, 2023) ............... 11

*Mendez v. Barr*,
    960 F.3d 80 (2d Cir. 2020) ......................................................... 25

*Meyer v. Uber Techs., Inc.*,
    868 F.3d 66 (2d Cir. 2017) .................................................... 40—41

*Mohamad v. Palestinian Auth.*,
    566 U.S. 449 (2012) ................................................................. 25

*Novak v. Kasaks*,
    216 F.3d 300 (2d Cir. 2000) ............................................... 18, 25—26

*Nwozuzu v. Holder*,
    726 F.3d 323 (2d Cir. 2013) ....................................................... 18

*Panther Partners Inc. v. Ikanos Commc'ns, Inc.*,
    681 F.3d 114 (2d Cir. 2012) ...................................................... 16

*Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.*,
    469 U.S. 189 (1985) ................................................................. 20

*Power Auth. v. M/V Ellen S. Bouchard*,
    968 F.3d 165 (2d Cir. 2020) .................................................. 25, 31

*Robinson v. Shell Oil Co.*,
    519 U.S. 337 (1997) ....................................................18, 19, 23, 25

*Ronzani v. Sanofi S.A.*,
    899 F.2d 195 (2d Cir. 1990) ....................................................... 34

*Ryder Energy Distrib. Corp. v. Merrill Lynch Commodities Inc.*,
    748 F.2d 774 (2d Cir. 1984) ....................................................... 34

*Salazar v. Global*,
No. 3:22-cv-00756, 2023 WL 4611819 (M.D. Tenn. July 18, 2023) ............ 11

*Salazar v. National Basketball Ass'n*,
--- F. Supp. 3d ---, 2023 WL 5016968 (S.D.N.Y. Aug. 7, 2023) .................... 4

*Sandifer v. U.S. Steel Corp.*,
571 U.S. 220 (2014) .................................................................................... 20

*Singleton v. Wulff*,
428 U.S. 106 (1976) .................................................................................... 40

*Sosa v. Alvarez-Machain*,
542 U.S. 692 (2004) .................................................................................... 25

*Spokeo v. Robins*,
578 U.S. 330 (2016) .................................................................................... 39

*Tawam v. Feld Ent. Inc.*,
No. 23-cv-357, 2023 WL 5599007 (S.D. Cal. July 28, 2023) ...................... 11

*TransUnion v. Ramirez*,
141 S. Ct. 2190 (2021) ........................................................................ *passim*

*United States v. Gomez*,
877 F.3d 76 (2d Cir. 2017) .......................................................................... 40

*United States v. Maria*,
186 F.3d 65 (2d Cir. 1999) .......................................................................... 24

*Wisc. Cent. Ltd. v. United States*,
138 S. Ct. 2067 (2018) ............................................................................ 20, 24

*Yershov v. Gannett Satellite Info. Network, Inc.*,
820 F.3d 482 (1st Cir. 2016) ........................................................................ 17

*Zepeda-Lopez v. Garland*,
38 F.4th 315 (2d Cir. 2022) .......................................................................... 18

**Statutes:**

18 U.S.C. § 2710 ...................................................................*passim*

28 U.S.C. § 1291 ............................................................................1

28 U.S.C. § 1331 ............................................................................1

**Constitutional Provisions:**

U.S. CONST. art. III ...............................................................*passim*

**Rules:**

FED. R. CIV. P. 12(b)(1) ................................................................9

FED. R. CIV. P. 12(b)(6) ................................................................9

FED. R. CIV. P. 15 .......................................................................14

FED. R. CIV. P. 15(a)(2) ..............................................................33

**Other Authorities:**

BLACK'S LAW DICTIONARY (11th ed. 2019) ..............................21

NBAGAMEWORN.NBA.COM, LeBron James – Purple Statement Edition –
Worn 2 Games – 3/31/23 & 4/2/23 (Recorded a Triple-Double),
https://nbagameworn.nba.com/iSynApp/productDisplay.action?
sid=1101561&productId=2582409 (last visited October 30, 2023)........................29

THE OXFORD ENGLISH DICTIONARY (2d ed. 1989) ...................21

THE OXFORD ENGLISH DICTIONARY (3d ed. 2014) ...................21

## JURISDICTIONAL STATEMENT

The district court had subject matter jurisdiction over Plaintiff's single-count lawsuit under 28 U.S.C. § 1331 because his claim arises under federal law—namely, the Video Privacy Protection Act, 18 U.S.C. § 2710. The district court granted Defendant's motion to dismiss on August 7, 2023, and entered the corresponding judgment on August 8, 2023. JA.191, JA.213. Two days later, on August 10, 2023, Plaintiff timely filed a notice of appeal. JA.214. This Court has subject matter jurisdiction to review the district court's final decision under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

The Video Privacy Protection Act defines the term "consumer" to include a "subscriber of goods or services from a video tape service provider." This appeal presents the following questions, the first of which—if answered in the affirmative—is dispositive:

1. Whether the broad statutory term "goods or services" includes an online newsletter;

2. Whether, as the district court held, Congress intended "goods or services" to mean only "audio-visual goods or services";

3. Whether, even if it did, an online newsletter with a curated list of links to video content qualifies as an "audio-visual good[] or service[]";

4. Whether, if it does not, Plaintiff should have been granted leave to amend his complaint—for the first time—in response to the court's concerns; and

5. Whether the statutory term "subscriber" should be read in conjunction with the correlated term "delivery" such that anyone who accepts delivery of video content is a "consumer."

## INTRODUCTION

At bottom, this appeal presents a single, straightforward issue—namely, whether an online newsletter falls within the broad, all-inclusive category of "goods or services." It does. In this case, that reality comes with consequences. The Video Privacy Protection Act ("VPPA") defines "consumer" to include a "subscriber of goods or services from a video tape service provider." Here, everyone agrees the National Basketball Association ("NBA") is a "video tape service provider." Likewise, everyone agrees Michael Salazar is a subscriber of the NBA's online newsletter. Accordingly, by the VPPA's plain text, he is a "consumer."

The only way to conclude otherwise is to rewrite the statute's unambiguous language. And that is exactly what the district court did here. Without determining that any statutory term was ambiguous, the court held an individual qualifies as a VPPA "consumer" only if he subscribes to *audio-visual* goods or services. The statute simply does not contain this limitation. The order dismissing Mr. Salazar's claim for failure to meet this nonexistent requirement was wrong as a matter of law.

Of course, even if the statute contained this limitation, the NBA's newsletter would still qualify. The newsletter contains a curated list of links to videos on NBA.com, directs subscribers to that content, and encourages and entices them to watch it. Put simply, the newsletter makes the NBA's videos easier to find and more convenient to view. Accordingly, it gives subscribers enhanced access to that video content. Again, the district court's contrary conclusion was wrong as a matter of law.

To the extent Mr. Salazar's initial complaint did not make these realities sufficiently clear, he should have been granted leave to amend. At the very least, he presented a colorable basis to conclude that the newsletter may meet the district court's reinterpreted standard. Under Rule 15, no more is required. On this front as well, the district court erred as a matter of law. And leave to amend was particularly appropriate here, given that the court's order imposed a series of requirements and limitations found nowhere in the statute's text.

As a final point, the court ignored the downstream effects of its limiting construction. In particular, its narrow interpretation of "goods or services" rendered another statutory term—namely, "subscriber"—ambiguous. The VPPA contains somewhat symmetrical definitions of "consumer" (*i.e.*, a "renter, purchaser, or subscriber" of certain materials) and "video tape service provider" (*i.e.*, one engaged in the "rental, sale, or delivery" of certain materials). If these definitions refer to the same underlying content, as the court concluded here, their structure suggests that

"subscriber" should be read to include all who accept "delivery" of that content. On this view, because Mr. Salazar watched videos on NBA.com, he was a "subscriber" of that delivered video content and, thus, a "consumer" under the VPPA.

For any of these reasons, or for all of them together, the order granting the NBA's motion to dismiss should be reversed. At the very least, Mr. Salazar should be granted leave to amend.

## STATEMENT OF THE CASE

In this lawsuit, Michael Salazar alleges the NBA violated the VPPA by disclosing his and others' personally identifiable information to Facebook without first obtaining consent. JA.7 (¶ 1). The NBA filed a motion to dismiss the complaint. JA.31–61. The Honorable Jennifer L. Rochon, District Judge for the Southern District of New York, granted the NBA's motion with prejudice, holding Mr. Salazar does not meet the statutory definition of a "consumer." JA.191–212. The opinion can be found at *Salazar v. National Basketball Ass'n*, --- F. Supp. 3d ----, 2023 WL 5016968 (S.D.N.Y. Aug. 7, 2023). This appeal ensued.

### The Complaint

On September 16, 2022, Mr. Salazar filed a lawsuit against the NBA for alleged violations of the VPPA. JA.7–26. In particular, he alleged the NBA intentionally installed the Facebook Pixel—a piece of code—on NBA.com. JA.8, JA.15–16 (¶¶ 4, 31–33). This invidious bit of code tracks when users enter the

website and what they do there, including when they view video content. *Id.* Without obtaining consent, the NBA then disclosed that video-watching history, along with users' Facebook IDs, to Facebook. JA.7–8, JA.15 (¶¶ 1, 4–5, 30). Any ordinary person can use the disclosed Facebook IDs "to quickly and easily locate, access, and view digital subscribers' corresponding Facebook profile." JA.8, JA.16 (¶¶ 5, 34). And the NBA "profit[ed] handsomely from its unauthorized disclosure[s]," all at the expense of its consumers' "statutorily protected privacy rights." JA.8–9 (¶¶ 6, 8).

Through NBA.com and an app, the NBA "delivers and . . . is in the business of delivering countless hours of video content." JA.10 (¶ 13.g). Mr. Salazar has a "digital subscription to NBA.com." JA.10, JA.19 (¶¶ 12, 46). To obtain it, he "sign[ed] up for an online newsletter." JA.12 (¶ 20). During the registration process, the NBA required Mr. Salazar to provide certain personal information, including his e-mail address and his IP address (*i.e.*, a unique number assigned to devices that reveals the user's "city, zip code and physical location"). JA.12–13, JA.19 (¶¶ 20, 22, 46). The NBA "maintains a vast digital database comprised of its digital subscribers' Personal Viewing Information, including the names and e-mail addresses of each digital subscriber and information reflecting the Video Media that each of its digital subscribers viewed." JA.17 (¶ 36).

After becoming a digital subscriber, Mr. Salazar had access to a variety of NBA.com content, including a broad array of video content. JA.10, JA.13 (¶¶ 13.e,

25). Mr. Salazar "used his NBA.com digital subscription to view Video Media through NBA.com . . . while logged into his Facebook account." JA.10 (¶ 12). As a result, the NBA disclosed his personally identifiable information—including his Facebook ID and which videos he watched—to Facebook. JA.10, JA.15, JA.17, JA.19, JA.23, JA.24 (¶¶ 12, 30, 32, 37, 43, 62, 66). The disclosures occur automatically as the result of the Facebook Pixel the NBA installed on its website. JA.15–16 (¶ 33). The NBA never informed Mr. Salazar that it would disclose this material to third parties, nor did Mr. Salazar consent to these disclosures. JA.10, JA.12–13, JA.15, JA.19–20, JA.23 (¶¶ 12, 19, 24, 26, 29, 42, 48, 64).

Accordingly, the NBA "knowingly disclosed to Facebook for its own personal profit the Personal Viewing Information of [its] digital subscribers," including Mr. Salazar, "together with additional sensitive personal information." JA.19 (¶ 41). Facebook and the NBA then used this information to create and display targeted advertising, for which each "received financial remuneration." JA.16 (¶ 35). In this way, the NBA "monetized its database by disclosing subscribers' Personal Viewing Information to Facebook." JA.17 (¶ 37). Further, the Facebook Pixel is entirely unnecessary to NBA.com's general operation; it exists and is "deployed . . . for the sole purpose of enriching [the NBA] and Facebook." JA.19 (¶ 44).

## The NBA's Motion to Dismiss

On December 2, 2022, the NBA filed a motion to dismiss the complaint. JA.31–61. It argued Mr. Salazar lacked Article III standing because he did not suffer an injury-in-fact. JA.45–49. Here, relying on its view that *TransUnion v. Ramirez*, 141 S. Ct. 2190 (2021), fundamentally transformed standing jurisprudence, the NBA argued that its alleged disclosures did not cause Mr. Salazar "any discernable real-world injury." JA.45. It argued Mr. Salazar did not allege any monetary loss and failed to offer "a credible theory of intangible harm," which it viewed as limited to "reputational damage or embarrassment." JA.47. Instead, it argued, Mr. Salazar alleged only that the NBA's unauthorized disclosures "resulted in Facebook learning something truthful about him." *Id.* And it argued, based on general First Amendment principles, that truthful communications are "generally lawful." *Id.*

The NBA also argued that Mr. Salazar failed to state a claim because he did not adequately allege he was a "consumer." JA.49–52. Here, the NBA argued that Mr. Salazar was not a "renter, purchaser, or subscriber" of "video tape services" from the NBA. JA.38; *see also* JA.49 (arguing Mr. Salazar "does not actually subscribe to any video goods or services from NBA.com"). It pointed out that Mr. Salazar's subscription to the newsletter was not "necessary to access the video content he viewed." JA.39; *see also* JA.51 (arguing the e-mail newsletter was "distinct and set apart from [the NBA's] video services"). Thus, the NBA argued, Mr. Salazar was not

"a 'subscriber' of 'prerecorded video cassette tapes or similar audio visual materials' from NBA.com." JA.50. Instead, the NBA conceded, Mr. Salazar subscribed to an e-mail newsletter created by the NBA and distributed through NBA.com. *Id.*[1]

In response, Mr. Salazar argued he has Article III standing because the NBA disclosed his personal information, without his consent, to a third party. JA.113–117. He noted that, in the privacy context, the *disclosure* of personal information—not its untruthfulness—causes a cognizable injury. JA.115. And, he concluded, the NBA's unauthorized disclosures permitted Facebook to use his "private information . . . in ways [he] would not have allowed." JA.117.

Mr. Salazar also pointed out that the NBA's arguments about his status as a "consumer" rewrote the statute by requiring him to subscribe to "video goods or services" (*i.e.*, the NBA's formulation) instead of simply "goods or services from a video tape service provider" (*i.e.*, the statute's language). JA.117–119. By subscribing to the NBA's newsletter, Mr. Salazar argued, he had subscribed to the

---

[1] The NBA made three additional arguments in its motion to dismiss. *First*, it argued it did not "knowingly disclose" Mr. Salazar's personally identifiable information because his device, not the NBA, actually sent the information to Facebook. JA.52–55. *Second*, it argued that, even if it knowingly disclosed Mr. Salazar's personally identifiable information, he consented to such disclosures by using NBA.com. JA.55–59. *Third*, it argued Mr. Salazar's class allegations should be dismissed based on a waiver contained in its Terms of Use, to which Mr. Salazar supposedly consented merely by using NBA.com. JA.59–61. As discussed below, the district court did not address, let alone resolve, any of these fact-bound arguments. *See infra* Part II.B. This Court should not resolve them in the first instance and should, instead, permit the district court to resolve them, if necessary, on remand. *See id.*

"goods or services" of the NBA, which is a "video tape service provider." *Id.*
Because the statute requires no more, he argued, he was a "consumer" under the
statute. *Id.*

### The District Court's Opinion

On August 7, 2023, the district court denied the NBA's "motion to dismiss for
lack of standing under Federal Rule of Civil Procedure ('Rule') 12(b)(1)" but
granted "its motion to dismiss for failure to state a claim under Rule 12(b)(6)."
JA.191. It began by addressing Mr. Salazar's standing. JA.198–204. It noted that the
"disclosure of private information is a harm that courts have traditionally considered
to be redressable." JA.201 (quoting *Carter v. Scripps Networks, LLC*, ---
F.Supp.3d ----, No. 22-cv-02031, 2023 WL 3061858, at *3 (S.D.N.Y. Apr. 24,
2023)). And it observed that *TransUnion*—the case the NBA believed transformed
standing jurisprudence—"specifically mentioned 'disclosure of private information'
as one of the intangible harms that was historically recognized as a legal injury." *Id.*
(quoting *TransUnion*, 141 S. Ct. at 2204). Likening his concrete injury to the one an
individual suffers in a claim for intrusion upon seclusion, the court confirmed that
Mr. Salazar has Article III standing to pursue his VPPA claim. JA.201–204.

With respect to the failure-to-state-a-claim argument, however, the court held
that Mr. Salazar was not a "consumer" under the VPPA. JA.204–210. It began by
defining "subscriber" as one with an ongoing "commitment, relationship, or

association (financial or otherwise)" with a given entity. JA.205–206. It then noted that the statutory definition of "consumer" refers to "the key phrase 'video tape service provider,'" which also appears in the statute's liability clause. JA.206. As a result, the court concluded that one could qualify as a "consumer" only by renting, purchasing, or subscribing to a video tape service provider's "audio visual material, not just any products or services from a video tape services provider." JA.207.

To support this conclusion, the court relied heavily on *Carter v. Scripps Networks, LLC*, --- F. Supp. 3d ----, 2023 WL 3061858 (S.D.N.Y. Apr. 24, 2023). JA.207–209. In that case, decided approximately four months earlier, a different judge in the Southern District of New York concluded that, "[i]n the [VPPA's] full context, a reasonable reader would understand the definition of 'consumer' to apply to a renter, purchaser or subscriber of audio-visual goods or services, and not goods or services writ large." *Carter*, 2023 WL 3061858, at *6; *see also* JA.207 (quoting this holding). In the *Carter* court's view, the statutory definition of "consumer" was "cabined by the definition of 'video tape service provider,' with its focus on the rental, sale or delivery of audio visual materials." *Id.* Thus, according to the *Carter* court, and repeated by the district court here, "the VPPA 'provides for an action by

a renter, purchaser [or] subscriber of audio visual materials, and not a broader category of consumers." JA.207 (quoting *Carter*, 2023 WL 3061858, at *6).[2]

Put simply, then, the district court here granted the NBA's motion to dismiss because Mr. Salazar "d[id] not plausibly allege that he was a subscriber of [the NBA's] video services." JA.208. It agreed Mr. Salazar subscribed to NBA.com's online newsletter but noted that the complaint "does not allege that the newsletters contained videos," nor that "a user must log in to watch the video [content on NBA.com]," nor that "the video content he accessed was exclusive to a subscribership." *Id.* Once again, the court leaned on *Carter*:

> Again, the Court agrees with the *Carter* court's analysis that reviewed a similar newsletter arrangement with a website. There, the court observed that "[t]he newsletters may entice or encourage recipients to view hgtv.com videos, but there is no assertion that a newsletter subscription was required to access those videos, functioned as a login, or gave newsletter subscribers extra benefits as viewers." *Carter*, 2023 WL 3061858, at *6. Thus, because the complaint did not support a claim that the "the plaintiffs acted as 'subscribers' when they viewed

---

[2] *Carter* appears to have been the first to offer this reading of "goods or services." Since *Carter* was decided, however, several other courts—including the district court here—have adopted its reasoning. *See, e.g.*, *Lamb v. Forbes Media LLC*, No. 22-cv-06319, 2023 WL 6318033, at *12 (S.D.N.Y. Sept. 28, 2023); *Alex v. NFL Enterprises LLC*, No. 1:22-cv-09239, 2023 WL 6294260, at *3–4 (S.D.N.Y. Sept. 27, 2023); *Carroll v. Gen. Mills, Inc.*, No. CV231746, 2023 WL 6373868, at *4 (C.D. Cal. Sept. 1, 2023); *Markels v. AARP*, No. 4:22-cv-5499, 2023 WL 6411720, at *3 (N.D. Cal. Aug. 29, 2023); *Golden v. NBCUniversal Media, LLC*, No. 22 CIV 9858, 2023 WL 5434378, at *10 (S.D.N.Y. Aug. 23, 2023); *Tawam v. Feld Ent. Inc.*, No. 23-cv-357, 2023 WL 5599007, at *5 (S.D. Cal. July 28, 2023); *Salazar v. Global*, No. 3:22-cv-00756, 2023 WL 4611819, at *11 (M.D. Tenn. July 18, 2023), *appeal filed,* No. 23-5748 (6th Cir. Aug. 21, 2023); *Gardener v. MeTV*, No. 22 CV 5963, 2023 WL 4365901, at *4 (N.D. Ill. July 6, 2023).

the videos on the hgtv.com, it d[id] not plausibly allege they were 'consumers' under the VPPA." *Id.* at \*7. The same result holds here. Plaintiff had the same access to videos on the NBA.com site as any other visitor to the site. *See id.* at \*6 ("Plaintiffs were free to watch or not watch hgtv.com videos without any type of obligation, no different than any of the other 9.9 million monthly visitors to the site.").

JA.208–209 (alteration in original). In the district court's view, then, Mr. Salazar was a "subscriber[] to newsletters, not [a] subscriber[] to audio visual materials." JA.209 (quoting *Carter*, 2023 WL 3061858, at \*6) (alterations in original); *see also* JA.210 (holding, on this basis, "that [Mr. Salazar's] subscription to [the NBA's] newsletter" did not "render[] him a consumer of goods or services from a video tape service provider under the VPPA").

As a final point, the court denied Mr. Salazar leave to amend his complaint based on futility. JA.211–212. In particular, the court believed amended allegations that "the newsletter included a link to video content on the NBA.com website" would be futile because "links to video content which is generally accessible on the NBA.com website are insufficient to create a subscribership relationship (or exchange of value) vis-à-vis video services" without "allegations regarding exclusive content or enhanced access." JA.210. Accordingly, the district court dismissed Mr. Salazar's VPPA claim with prejudice. JA.212.

## SUMMARY OF THE ARGUMENT

As relevant here, to qualify as a "consumer" under the VPPA, one must be a "subscriber of goods or services from a video tape service provider." For this

analysis, it is useful to begin with points of agreement. The NBA is a "video tape service provider." Indeed, it never argued otherwise. And Mr. Salazar subscribes to the NBA's online newsletter. The NBA conceded as much.

The only remaining question, then, is whether the NBA's online newsletter counts as a "good[] or service[]." It does. Indeed, the VPPA's broad statutory language encompasses the NBA's entire economic output. This appeal can thus be resolved by a rather straightforward bit of statutory interpretation. Mr. Salazar subscribes to an online newsletter (*i.e.*, a "good[] or service[]") of the NBA (*i.e.*, a "video tape service provider"). By the VPPA's plain text, this fact means he is a "consumer." The analysis can—and should—end here.

To conclude that Mr. Salazar is *not* a statutory "consumer," the district court committed a series of overlapping legal errors. To start, it held that one is a "consumer" only if he subscribes to "audio visual goods or services." This holding casts aside the statute's unambiguous language and imposes a limitation found nowhere in the VPPA. In essence, to dismiss Mr. Salazar's complaint, the court impermissibly rewrote the statute.

Even if the court's rewrite were correct, and one is a consumer only if he subscribes to "*audio visual* goods or services," Mr. Salazar would still qualify. The NBA's online newsletter contained a curated list of links to videos on NBA.com, directed subscribers to that video content, and otherwise "enticed or encouraged"

them to watch the NBA's videos. As such, the online newsletter constituted either an "audio visual good" or, at the very least, an "audio visual service." The district court's contrary conclusion was wrong as a matter of law.

Assuming the online newsletter did not qualify as an "audio visual good[] or service[]"—based on the allegations contained in his initial complaint—Mr. Salazar should have been granted leave to file a first amended complaint. Notwithstanding this Circuit's pronouncements favoring amendment, however, the district court denied him that opportunity based on its view that any amendment would be futile. This conclusion, too, was wrong as a matter of law. Mr. Salazar advanced a "colorable" basis to conclude the online newsletter "may" meet the district court's new test. Rule 15's liberal amendment policy requires no more.

Moreover, the district court's reinterpretation of "goods or services" injects ambiguity elsewhere in the statute. The court ignored this result. If "goods and services" in Section 2710(a)(1) means the same thing as "prerecorded video cassette tapes or similar audio visual materials" in Section 2710(a)(4), the definitions' symmetry suggests "subscriber" should not be given its ordinary meaning. In particular, Section 2710(a)(1)'s definition of "consumer" concerns a "renter, purchaser, or *subscriber*" of certain material. Section 2710(a)(4)'s definition of "video tape service provider" concerns the "rental, sale, or *delivery*" of certain material. If that underlying material is the same—as the district court held—

"subscriber," in this specific statutory context, must be read to include all those who have accepted "delivery" of that material. And Mr. Salazar meets this standard because he watched videos—and, thus, accepted delivery of them—on NBA.com.

For any one of these reasons, or for all of them combined, the district court's order granting the NBA's motion to dismiss should be reversed. The other arguments the NBA raised below do not alter this conclusion. To start, the NBA advanced a standing argument foreclosed by the very Supreme Court case on which it purported to rely. As the Supreme Court has acknowledged, the disclosure of personal information gives rise to a concrete injury-in-fact. The district court chose not to address the NBA's remaining arguments—about whether the disclosures were "intentional" and whether Mr. Salazar consented to them or to a class-action waiver merely by navigating to or remaining on NBA.com. It should be permitted to do so, in the first instance, on remand.

## STANDARD OF REVIEW

This Court reviews a grant of a motion to dismiss *de novo*. *See, e.g.*, *City of Pontiac Gen. Emps.' Ret. Sys. v. MBIA, Inc.*, 637 F.3d 169, 173 (2d Cir. 2011). In doing so, this Court "accept[s] all factual allegations in the complaint as true" and "draw[s] all reasonable inferences in the plaintiff's favor." *Id.* Likewise, the district court's legal conclusions, including its interpretations of a statute, are "reviewed *de novo*." *Id.*; *see also Fisher v. Aetna Life Ins. Co.*, 32 F.4th 124, 135 (2d Cir. 2022)

(holding that, [f]or issues concerning statutory interpretation, . . . the standard of review is also de novo"); *Auburn Hous. Auth. v. Martinez*, 277 F.3d 138, 143 (2d Cir. 2002) ("Questions of statutory interpretation are reviewed *de novo*.").

Finally, a denial of leave to amend is reviewed *de novo* when it is "based on an interpretation of law, such as futility," because that legal conclusion must be reviewed *de novo*. *Panther Partners Inc. v. Ikanos Commc'ns, Inc.*, 681 F.3d 114, 119 (2d Cir. 2012); *see also Bensch v. Estate of Umar*, 2 F.4th 70, 80 (2d Cir. 2021) ("[T]o the extent the denial of [leave to amend] is based on futility, it rests on a legal conclusion, which we review *de novo*.").

## ARGUMENT

In this appeal, and at least for purposes of the motion to dismiss, three critical issues are undisputed. *First*, everyone agrees the NBA is a "video tape service provider" under the VPPA. 18 U.S.C. § 2710(a)(4) (defining that term, as relevant here, as any person engaged in the business of "rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials"). Indeed, the NBA never argued otherwise.

*Second*, everyone agrees the information allegedly disclosed to Facebook—which includes users' Facebook IDs and video-watching histories—constitutes "personally identifiable information" under the VPPA. 18 U.S.C. § 2710(a)(3) (defining that term to "include[] information which identifies a person as having

requested or obtained specific video materials or services from a video tape service provider"). Again, the NBA never argued otherwise.

*Third*, everyone agrees there are no allegations establishing that Mr. Salazar was a "renter" or "purchaser" of the NBA's "goods or services." 18 U.S.C. § 2710(a)(1); *see also* JA.204 (noting that "[n]either party asserts that Plaintiff is a 'renter' or 'purchaser'").

Accordingly, the dispute here is narrow. The only question is whether Mr. Salazar qualifies as a "consumer" because he is a "subscriber" of the NBA's "goods or services." 18 U.S.C. § 2710(a)(1). Here again, however, there is substantial agreement about the facts. For example, everyone agrees Mr. Salazar subscribes to the NBA's newsletter. JA.50 (conceding, in the motion to dismiss, that Mr. Salazar "subscribed to an email *newsletter*"); JA.194, JA.208–210 (holding, in the order granting the motion to dismiss, that Mr. Salazar had a "subscription to [the NBA's] newsletter").[3] Likewise, all agree that the NBA delivered Mr. Salazar audio-visual materials. JA.37, JA.39, JA.50 (conceding, in the motion to dismiss, that

---

[3] At least two circuits have addressed the meaning of the term "subscriber" as used in the VPPA. *See, e.g.*, *Yershov v. Gannett Satellite Info. Network, Inc.*, 820 F.3d 482, 487 (1st Cir. 2016) (defining subscription to include an "agreement to receive or be given access to electronic texts or services"); *Ellis v. Cartoon Network, Inc.*, 803 F.3d 1251, 1256 (11th Cir. 2015) (holding that a "'subscription' involves some type of commitment, relationship, or association (financial or otherwise) between a person and an entity"). As discussed more fully below, however, this appeal does not concern the meaning of *that* statutory term. Instead, it hinges on the meaning of the term "goods or services."

Mr. Salazar viewed "video content" on NBA.com); JA.194 (noting, in the order granting the motion, that Mr. Salazar watched videos on NBA.com).

These allegations establish that Mr. Salazar is a "subscriber" of the NBA's "goods and services." As such, he is a "consumer" under the VPPA. To conclude otherwise, the district court simply rewrote the statute. The order granting the NBA's motion to dismiss should be reversed.

## I. Mr. Salazar Is a "Subscriber of Goods or Services from a Video Tape Service Provider."

It is black-letter law that statutory interpretation begins with the text. *See, e.g.*, *Zepeda-Lopez v. Garland*, 38 F.4th 315, 320 (2d Cir. 2022) ("When interpreting a statutory provision, we begin with the language of the statute."); *Nwozuzu v. Holder*, 726 F.3d 323, 327 (2d Cir. 2013) (same); *Novak v. Kasaks*, 216 F.3d 300, 310 (2d Cir. 2000) ("We look first to the text of the statute.").

When the statutory language is unambiguous, the Court's inquiry also ends with the text. *See, e.g.*, *BedRoc Ltd., LLC v. United States*, 541 U.S. 176, 183 (2004) ("[O]ur inquiry begins with the statutory text, and ends there as well if the text is unambiguous."); *Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 462 (2002) ("When the words of a statute are unambiguous, then, this first canon is also the last: 'judicial inquiry is complete.'"); *Robinson v. Shell Oil Co.*, 519 U.S. 337, 340 (1997) ("Our inquiry must cease if the statutory language is unambiguous and 'the statutory scheme is coherent and consistent.'"); *Novak*, 216 F.3d at 310 (holding that, if the language "is plain and its meaning sufficiently clear, we need look no further").

And "[t]he plainness or ambiguity of statutory language" must be "determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole." *Robinson*, 519 U.S. at 341. Critically, though, the Court must review the language actually present in the statute, not previous versions of the statute or language Congress might have used but did not. *See, e.g.*, *Lamie v. U.S. Trustee*, 540 U.S. 526, 534–36 (2004) (focusing on "the existing statutory text" to conclude that the statute was not ambiguous).

This interpretative methodology flows from the "preeminent canon of statutory interpretation"—namely, that Congress "says in a statute what it means and means in a statute what it says there." *BedRoc*, 541 U.S. at 183; *see also Ct. Nat'l Bank v. Germain*, 503 U.S. 249, 253–54 (1992) (describing this interpretive presumption as the "cardinal canon" courts must "always turn . . . to . . . before all others"). When the statutory language is plain and unambiguous, "the sole function of the courts—at least where the disposition required by the text is not absurd—is to enforce it according to its terms." *Lamie*, 540 U.S. at 534.

Here, the VPPA unambiguously defines "consumer" to mean "any renter, purchaser, or subscriber of goods or services from a video tape service provider." 18 U.S.C. § 2710(a)(1). As discussed above, the NBA is a "video tape service provider." *See supra* at 16. Per the statute's plain text, then, Mr. Salazar is a "consumer" if he subscribes to the NBA's "goods or services." 18 U.S.C. § 2710(a)(1). Because the

online newsletter to which he subscribed is unquestionably a "good[] or service[]," Mr. Salazar meets the statutory definition. Accordingly, the district court's holding that he did not qualify as a "consumer" was wrong as a matter of law.

### A. The broad statutory phrase "goods or services" plainly includes the NBA's online newsletter.

As discussed above, everyone agrees Mr. Salazar subscribes to the NBA's online newsletter. *See supra* at 17. And everyone agrees the NBA is a "video tape service provider." *See supra* at 16. According to the statute's plain text, the only remaining question is whether the online newsletter is a "good[] or service[]" of the NBA. 18 U.S.C. § 2710(a)(1).

The VPPA does not define "goods" or "services." As a result, those terms must be accorded their common, everyday meaning. *See, e.g.*, *Wisc. Cent. Ltd. v. United States*, 138 S. Ct. 2067, 2070 (2018) (explaining that, when interpreting a statutory term, a court's "job is to interpret the words consistent with their 'ordinary meaning . . . at the time Congress enacted the statute'" (omission in original)); *Sandifer v. U.S. Steel Corp.*, 571 U.S. 220, 227 (2014) (holding that, when statutory terms are undefined, they "will be interpreted as taking their ordinary, contemporary, common meaning"); *Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.*, 469 U.S. 189, 194 (1985) ("Statutory construction must begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose."). To determine a term's "ordinary meaning, courts may look to

contemporary dictionary definitions." *El Omari v. Int'l Crim. Police Org.*, 35 F.4th 83, 88 (2d Cir. 2022), *cert. denied*, 143 S. Ct. 214 (2022).

At the time of the VPPA's passage in 1988, the term "goods" was commonly understood to mean "property or possessions" and, more particularly, "movable property." THE OXFORD ENGLISH DICTIONARY (2d ed. 1989). In fact, that common meaning has not changed much over time. *See, e.g.*, THE OXFORD ENGLISH DICTIONARY (3d ed. 2014) (defining "goods" to mean "economic assets which have a tangible, physical form"); BLACK'S LAW DICTIONARY (11th ed. 2019) (defining "goods" to mean "[t]angible or movable personal property other than money; esp., articles of trade or items of merchandise"). Likewise, the term "services" has long been understood to mean "the section of the economy that supplies needs of the consumer but produces no tangible goods." THE OXFORD ENGLISH DICTIONARY (3d ed. 2014). The combination of the two terms, then, as exists in the VPPA, necessarily refers to society's entire economic output.

The NBA's online newsletter plainly falls within the statute's all-inclusive "goods or services" language. It is either a tangible asset or part of the section of the economy that meets consumers' needs without producing tangible assets. Of course, one hardly needs to resort to a dictionary, of any vintage, to understand that the broad term "goods or services" embraces more than audio-visual content. In any event, the text is clear. By subscribing to an online newsletter (*i.e.*, a "good[] or service[]")

produced and disseminated by the NBA (*i.e.*, a "video tape service provider"), Mr. Salazar became a "subscriber of the goods or services of a video tape service provider." 18 U.S.C. § 2710(a)(1). The statutory text admits of no other possibility.

At least two district courts have faithfully applied the VPPA's unambiguous text in precisely this manner. *See, e.g.*, *Buechler v. Gannett Co., Inc.*, No. CV 22-1464, 2023 WL 6389447, at *2 (D. Del. Oct. 2, 2023) (holding that a "newsletter is a good or service within the scope of the VPPA" and rejecting an argument that it was outside "the VPPA's ambit" because it "bears no connection to . . . video content"); *Lebakken v. WebMD, LLC*, 640 F. Supp. 3d 1335, 1339–41 (N.D. Ga. 2022) (holding that a subscriber to a newsletter was a "consumer" under the VPPA).

Accordingly, Mr. Salazar is a "consumer" under the VPPA. And, because he is a consumer, the alleged disclosures of his "personally identifiable information" to Facebook violate the law. 18 U.S.C. § 2710(b)(1). There is nothing absurd, inconsistent, or unusual about this result. The VPPA's definition of "consumer" should be "enforce[d] . . . according to its terms." *Lamie*, 540 U.S. at 534.

Considering the statutory text more broadly does not alter this conclusion. To start, the term "goods or services," by itself, is not ambiguous. Indeed, the NBA never argued otherwise. And the district court never concluded otherwise either. Nor does any other term, phrase, or provision of the VPPA render "goods or services" ambiguous. In fact, just the opposite is true. The VPPA's "broader context,"

22

*Robinson*, 519 U.S. at 341, confirms Congress intended "goods or services" to cover more than just audio-visual content.

For example, Congress thrice used different language to focus narrowly on audio-visual content. *First*, in the definition of "personally identifiable information," Congress used the term "video materials or services." 18 U.S.C. § 2710(a)(3). *Second*, in the definition of "video tape service provider," Congress deployed the term "prerecorded video cassette tapes or similar audio visual materials." 18 U.S.C. § 2710(a)(4). *Third*, when outlining permitted disclosures, Congress used the phrase "video tapes or other audio visual material." 18 U.S.C. § 2710(b)(2)(D)(ii). As a result, there is every reason to believe that, when Congress used the broader term "goods or services" to define "consumer," it said what it meant and meant what it said. *See BedRoc*, 541 U.S. at 183.

If Congress meant to cover only a narrower subset of a video tape service provider's economic output in the definition of "consumer," it knew exactly how to do so. *See, e.g.*, *Jama v. Immigration & Customs Enf't*, 543 U.S. 335, 341 (2005) ("We do not lightly assume that Congress has omitted from its adopted text requirements that it nonetheless intends to apply, and our reluctance is even greater when Congress has shown elsewhere in the same statute that it knows how to make such a requirement manifest."). The VPPA's definition of "consumer"—which includes all those who rent, purchase, or subscribe to a video tape service provider's "goods or services"—was intentional, not some absentminded oversight.

Put simply, there is no basis to conclude—as the district court did here—that the very different term "goods or services," 18 U.S.C. § 2710(a)(1), means the same thing as "video materials or services," 18 U.S.C. § 2710(a)(3), "prerecorded video cassette tapes or similar audio visual materials," 18 U.S.C. § 2710(a)(4), and "video tapes or other audio visual material," 18 U.S.C. § 2710(b)(2)(D)(ii).[4] Such a conclusion requires one to assume Congress did not mean what it said when it defined "consumer," but instead meant something else entirely. In this way, the district court's analysis violates the "preeminent" and "cardinal" canon of statutory construction. *BedRoc*, 541 U.S. at 183; *Germain*, 503 U.S. at 253.

It also flouts the general understanding that "the use of different words within the same statutory context strongly suggests that different meanings were intended." *U.S. v. Maria*, 186 F.3d 65, 71 (2d Cir. 1999); *see also Wisc. Cent. Ltd. v. U.S.*, 138 S. Ct. 2067, 2071–72 (2018) (holding courts "usually presume differences in language . . . convey differences in meaning" and Congress's choice to use different language "requires respect, not disregard"); *Henson v. Santander Consumer USA*

---

[4] The three video-specific references, although slightly different, may mean the same thing. Because "Congress sometimes uses slightly different language to convey the same message," courts "must be careful not to place too much emphasis on the marginal semantic divergence" between terms. *DiPierre v. U.S.*, 564 U.S. 70, 83 (2011) (citation omitted). The terms "video materials or services," "prerecorded video cassette tapes or similar audio visual materials," and "video tapes or other audio visual material" seem to fall comfortably within the realm of "marginal semantic divergence." The separate term "goods or services" does not.

*Inc.*, 582 U.S. 79, 86 (2017) (similar); *Mohamad v. Palestinian Auth.*, 566 U.S. 449, 456 (2012) ("We generally seek to respect Congress' decision to use different terms to describe different categories of people or things."); *Sosa v. Alvarez-Machain*, 542 U.S. 692, 711 n.9 (2004) (similar); *Mendez v. Barr*, 960 F.3d 80, 87 (2d Cir. 2020) (similar); *Cruz-Miguel v. Holder*, 650 F.3d 189, 196 (2d Cir. 2011) (similar).

The district court certainly did not explain why Congress would have used the all-encompassing term "goods or services" and three far narrower video-specific terms "cheek by jowl," *Henson*, 582 U.S. at 84, in the same statute intending that both the broad term and the narrow terms would mean the exact same thing. The NBA never explained it either. The reason is simple: There is no explanation. Congress intentionally used these different terms to convey different meanings.

The term "goods or services" is not ambiguous, either standing alone or in its broader context. The analysis can—and should—end there. *See, e.g.*, *BedRoc*, 541 U.S. at 183 (holding that a court's inquiry "ends" with the statutory text "if the text is unambiguous"); *Barnhart*, 534 U.S. at 462 (holding that, when a statute's text is unambiguous, "judicial inquiry is complete"); *Robinson*, 519 U.S. at 340 (holding that, when "statutory language is unambiguous," the judicial "inquiry *must* cease" (emphasis added)); *Power Auth. v. M/V Ellen S. Bouchard*, 968 F.3d 165, 170 (2d Cir. 2020) (holding that courts may "turn to canons of statutory construction for assistance in interpreting [a] statute" only "if the text is ambiguous"); *Novak*, 216

F.3d at 310 (holding that, when the statutory text is unambiguous, "no resort to legislative history or the purposes of the [statute] is required").

Without an ambiguity, there is nothing else for this Court to do. The VPPA's definition of "consumer" must be enforced according to its plain terms. The district court's order should be reversed on this basis alone.

B. **In holding that Mr. Salazar was not a "consumer," the district court improperly narrowed the statute's unambiguous language.**

To dismiss Mr. Salazar's claim, the district court sidestepped the VPPA's plain text and its inclusion of the broad term "goods and services." 18 U.S.C. § 2710(a)(1). At the NBA's urging, the court redefined "consumer" to include only those who rent, purchase, or subscribe to "audio visual materials, not just any products or services from a video services provider." JA.207 (relying on *Carter* to conclude that a "consumer" is "a renter, purchaser or subscriber of audio-visual goods or services, and not goods or services writ large"); JA.208 (agreeing with the NBA that Mr. Salazar "does not plausibly allege that he was a subscriber of [the NBA's] video services"); JA.210 n.3 (holding a case was not "persuasive because its subscribership analysis was not sufficiently tethered to video services").[5]

---

[5] In this analysis, the district court simply repeated the NBA's errors. *See, e.g.*, JA.37–38 (arguing the VPPA protects only those who rent, purchase, or subscribe to "video tape service[s]" (alteration in original)); JA.49 (arguing Mr. Salazar was not a "consumer" because he did not subscribe to "any video goods or services from NBA.com"); JA.50 (arguing he was not a "subscriber" of "prerecorded video cassette tapes or similar audio visual materials" from NBA.com).

As these quotations make clear, the district court reached the wrong conclusion because it asked the wrong question. As discussed above, *see supra* Part I.A., the VPPA does not require a consumer to subscribe to a video tape service provider's "audio visual materials," "audio-visual goods or services," "video services," "video tape services," "video goods or services," or "prerecorded video cassette tapes or similar audio visual materials."

To count as a "consumer," the VPPA requires only that an individual subscribe to a video tape service provider's "goods or services." It contains no limitation on the kinds of "goods or services" that count to confer "consumer" status. *See, e.g.*, *Harris v. Pub. Broad. Serv.*, No. 1:22-cv-2456, 2023 WL 2583118, at *4 (N.D. Ga. Mar. 20, 2023) (noting that, "at first glance, the VPPA requires only a subscription to *any* goods or services, not to goods or services related to video," but declining to resolve the question because the plaintiff "adequately alleged subscription to Defendant's video services").

To conclude otherwise, the court simply rewrote an unambiguous statute. It based its analysis on two interrelated—and equally misguided—justifications. *First*, the court noted that both the VPPA's definition of "consumer" and its liability clause refer to the term "video tape service provider." JA.206. *Second*, again without finding any ambiguity, it turned to legislative history, observing that:

> The 1988 Senate Report notes that the definition of [personally identifiable information] at section 2710(a)(3) is drafted "to make clear

27

that simply because a business is engaged in the sale or rental of video materials or services does not mean that all of its products or services are within the scope of the bill. For example, a department store that sells video tapes would be required to extend privacy protection to only those transactions involving the purchase of video tapes and not other products."

JA.207. The court's analysis ignores how these provisions work.

To start, the VPPA provides that "[a] video tape service provider who knowingly discloses, to any person, personally identifiable information concerning any consumer of such provider shall be liable to the aggrieved person." 18 U.S.C. § 2710(b)(1). As the legislative history the district court cited makes clear, Congress did not restrict the VPPA's coverage by narrowly defining "consumer." It did so by narrowly defining "personally identifiable information." JA.207 (highlighting the 1988 Senate Report's discussion of "the definition of PII at section 2710(a)(3)," *not* the definition of "consumer" at Section 2710(a)(1)).

In particular, the VPPA defines "personally identifiable information" to "include[] information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider." 18 U.S.C. § 2710(a)(3). Thus, Congress ensured a video tape service provider's entire range of products and services would not be "within the scope of the bill" and that its "privacy protection" extended "only [to] those transactions" involving audio-visual materials by prohibiting disclosure of a narrow subset of information. The VPPA's operation becomes clearer if one inserts its definitions into the liability clause:

> A [person, engaged in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials] who knowingly discloses, to any person, [information which identifies a person as having requested or obtained specific video materials or services] concerning any [renter, purchaser, or subscriber of goods or services] of such provider shall be liable to the aggrieved person for the relief provided in subsection (d).

18 U.S.C. § 2710(b)(1) (with language from 18 U.S.C. § 2710(a)(4), 18 U.S.C. § 2710(a)(3), and 18 U.S.C. § 2710(a)(1), respectively, inserted to replace statutorily defined terms). By its plain terms, the statute prohibits disclosure only of information that identifies a consumer as having obtained specific video content.

An example may help demonstrate the point. Suppose a video tape service provider delivers video content to a particular individual. Assume the delivery of that video content, standing alone, does not give the video tape service provider access to the individual's name, home address, IP address, phone number, or any similar information. From the video tape service provider's perspective, it has delivered video content to an anonymous individual.

Suppose further that this individual buys a good from the video tape service provider. For purposes of this hypothetical, assume the good is entirely unrelated to the delivered video content—say, a $150,000 game-used LeBron James jersey. *See* NBAGAMEWORN.NBA.COM, LeBron James – Purple Statement Edition – Worn 2 Games – 3/31/23 & 4/2/23 (Recorded a Triple-Double), https://nbagameworn.nba.com/iSynApp/productDisplay.action?sid=1101561&productId=2582409 (last visited October 30, 2023).

Suppose that, by virtue of this unrelated purchase, the video tape service provider learns the individual's name, home address, IP address, and phone number. And, via a powerful digital database, assume the video tape service provider can link this newfound personal information to the individual's history of viewing video content (*i.e.*, which specific videos he watched and for how long).

Under Section 2710(a)(1), the individual became a "consumer" when he purchased the game-used jersey from the video tape service provider. Under Section 2710(b)(1), the video tape service provider generally cannot disclose to a third party the individual's name, home address, IP address, phone number, and history of viewing video content. That information, *combined*, amounts to "personally identifiable information." 18 U.S.C. § 2710(a)(3). As such, disclosure of that combined information, without the consumer's consent, would result in liability.

But the video tape service provider would clearly be free—under the VPPA's plain language—to disclose to a third party the individual's name, home address, IP address, phone number, and the fact that he purchased a game-used LeBron James jersey. Even though the individual remains a "consumer," that hypothetically disclosed information would not amount to "personally identifiable information" under the statute. 18 U.S.C. § 2710(a)(3). His name, home address, IP address, phone number, and the fact that he bought a game-used jersey do not "identif[y him] as having requested or obtained specific video materials or services." *Id.* In this way,

Congress ensured video tape service providers were required to extend "privacy protection" only to video content, and *not* to all their products and services. JA.207.

The district court's rewrite, then, impermissibly "narrow[ed] the scope of the [VPPA] beyond what the words of the statute support." *Power Auth.*, 968 F.3d at 171 (rejecting a statutory interpretation that would "construe the [law] more narrowly than its text would suggest"). And the court undertook the forbidden rewrite to achieve a goal the unaltered statutory text already accomplished.

**C.  Even if the term "goods or services" were intended to mean only audio-visual goods or services, the NBA's newsletter would qualify.**

Having rewritten the definition of "consumer" to apply only to those who subscribe to a video tape service provider's "audio visual materials" or "audio-visual goods or services," JA.207, the district court proceeded *not* to apply its newly minted test. It noted that the NBA's online newsletter allegedly (1) contained links to video content, and (2) directed subscribers to video content. JA.209–210. It even mentioned, in a somewhat roundabout way, that the newsletters might "entice or encourage recipients to view [the NBA's] videos." JA.208. The next problem with the district court's order, then, is that the NBA's online newsletters—which contained links to videos, directed subscribers to video content, and otherwise "entice[d] or encourage[d]" them to watch the NBA's videos—were, in fact, "audio-visual goods or services." Even accepting the court's redefinition of "consumer," Mr. Salazar *still* met the test.

To avoid this straightforward conclusion, the district court doubled down on its rewrite. It held that Mr. Salazar's subscription to a newsletter that contained links to videos, directed subscribers to video content, and enticed and encouraged them to view it was insufficient because the complaint did not allege that the newsletters gave subscribers "exclusive content or enhanced access" to such video materials. JA.210. Nor, it noted, did the complaint allege that the newsletters were "required" to access the video content, "functioned as a login," or gave Mr. Salazar unique "access to videos on the NBA.com site" that the general public lacked. JA.208–209.

To start, these requirements appear nowhere in the statute. The VPPA never mentions, let alone requires, that video content be "exclusive" or that access to it be "enhanced" beyond what is afforded to the general public. Nor does the statute require subscriptions to double as "logins" or be strictly "required" to view video content. On this front, the district court's analysis is completely untethered to the statute's language. It dismissed Mr. Salazar's VPPA claim for failure to meet requirements Congress never even mentioned, let alone enacted.

It did so based on an additional narrowing of its own redefinition. Even if—counterfactually—the VPPA required consumers to subscribe to "audio-visual goods or services," the term would include more than just the videos themselves. A list of curated links to videos a subscriber might enjoy, for example, would facially seem to be either an "audio-visual good" or an "audio-visual service." To conclude

otherwise, the district court effectively replaced its own insertion of "audio-visual goods or services" in the definition of "consumer" with the even narrower term "video content." In this second iteration, an individual seemingly qualifies only if he subscribes directly to the video content itself. This requirement—like the court's earlier rewrite—finds no textual support in the VPPA.

Perhaps even worse, the district court's analysis of "enhanced access" is wrong as a matter of law. A newsletter that contains links to various video content provides "enhanced access" to such content by making it easier and more convenient for a subscriber to view it. Because of the newsletter, Mr. Salazar did not need to employ general internet searches or scour NBA.com to find content that might interest him. Instead, he merely needed to review a curated list in his e-mail inbox and click a link. Because only subscribers received the curated list of links contained in the newsletters, the general public did not share the same access to the NBA's video content. Even accepting the court's extra-statutory requirement of "enhanced access," then, Mr. Salazar still meets the test and qualifies as a "consumer."

**D.      The court compounded these legal errors by denying Mr. Salazar leave to amend.**

The Rules provide that courts "should freely give leave [to amend] when justice so requires." FED. R. CIV. P. 15(a)(2). The Supreme Court has admonished that "this mandate is to be heeded." *Foman v. Davis*, 371 U.S. 178, 182 (1962). "If the underlying facts or circumstances relied upon by a plaintiff *may* be a proper

subject of relief, he ought to be afforded an opportunity to test his claim on the merits." *Id.* (emphasis added).

This Court has echoed that sentiment, holding that justice "require[s]" leave to amend when a plaintiff "has at least colorable grounds for relief." *Ryder Energy Distrib. Corp. v. Merrill Lynch Commodities Inc.*, 748 F.2d 774, 783 (2d Cir. 1984). Such leave should be denied only when there is a valid reason—like "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [or] futility." *Foman*, 371 U.S. at 182. Accordingly, "the usual practice," when a motion to dismiss is granted, "is to grant leave to amend." *Ronzani v. Sanofi S.A.*, 899 F.2d 195, 198 (2d Cir. 1990).

Here, the district court departed from the "usual practice" and denied Mr. Salazar leave to amend based on its view that any amendment would be futile. JA.211–212. It reached this conclusion based on its earlier assessment that the NBA's newsletter, with links to videos, did not qualify as an "audio-visual good or service." JA.209–210. That conclusion was wrong as a matter of law. *See supra* Part I.C.

But, even if it were not, Mr. Salazar should have been permitted to amend his complaint to address the court's narrowed definition of "consumer." In particular, he should have been afforded an opportunity to add allegations about whether and to what extent the NBA's online newsletter gave subscribers "exclusive content or

enhanced access" to video content. JA.210. Such allegations would establish that he met the district court's redefinition of "consumer." At the very least, the existing allegations show there is a "colorable" ground to conclude he does.

Accordingly, Mr. Salazar should have been granted leave to amend his complaint to add allegations to establish that the online newsletters were "audio-visual goods or services." The district court's determination that any such amendment would be futile was wrong as a matter of law.

**E.    The district court's analysis overlooks the statutory correlation between "subscriber" in Section 2710(a)(1) and "delivery" in Section 2710(a)(4).**

As discussed above, *see supra* at 19, courts must view a statute as a cohesive whole. *See, e.g.*, *King v. Burwell*, 576 U.S. 473, 497 (2015) ("depart[ing] from what would otherwise be the most natural reading of the pertinent statutory phrase" because that reading, while seemingly appropriate when the phrase was "viewed in isolation," became "untenable in light of [the statute] as a whole," including its "context and structure" (second alteration in original)).

When the VPPA is viewed as a whole, a certain symmetry emerges between the definitions of "consumer" and "video tape service provider." The statute defines "consumer" to include "any *renter, purchaser, or subscriber* of goods or services from a video tape service provider." 18 U.S.C. § 2710(a)(1) (emphasis added). It then defines "video tape service provider" to include "any person . . . in the business

. . . of *rental, sale, or delivery* of prerecorded video cassette tapes or similar audio visual materials." 18 U.S.C. § 2710(a)(4) (emphasis added).

At first blush, these provisions appear to concern different underlying material—"goods or services," in one instance, and "prerecorded video cassette tapes or similar audio visual materials," in the other. Mr. Salazar continues to believe Congress's use of different terms was intentional and should be respected. *See supra* Parts I.A–B. But, if the district court is right in concluding that "goods or services" means the same thing as "prerecorded video cassette tapes or similar audio visual materials," the definitions reach near-perfect symmetry.

| **"Video Tape Service Provider"** <br> **18 U.S.C. § 2710(a)(4)** | | **"Consumer"** <br> **18 U.S.C. § 2710(a)(1)** |
|:---:|:---:|:---:|
| rental | → | renter |
| sale | → | purchaser |
| delivery | → | subscriber |

If these statutory definitions refer to the same underlying content—as the district court held here—the term "subscriber" becomes ambiguous. In this specific statutory context, the definitions' symmetry suggests that "subscriber" should be read not to take its ordinary and common meaning but to refer to those who accept "delivery" of that identical underlying content from a video tape service provider. In this analysis, "subscriber" becomes more akin to "recipient." The modified statute's structure practically compels this result.

To be clear, this reading is less faithful to Congress's language (*i.e.*, "goods or services" vs. "prerecorded video cassette tapes or similar audio visual materials") than Mr. Salazar's earlier argument. *See supra* Part I.A. But it is the logical, if not inevitable, consequence of the district court's narrowing construction that reads those different terms to mean the same thing.

On this reading, too, Mr. Salazar is a statutory "subscriber" because he accepted delivery of video content while browsing NBA.com. This analysis provides an alternative basis to reverse the order granting the NBA's motion to dismiss.

## II.    The NBA's Other Arguments Below Do Not Alter These Conclusions.

The NBA advanced two additional strands of argument below. *First*, relying on *TransUnion v. Ramirez*, 141 S. Ct. 2190 (2021), it argued Mr. Salazar lacks Article III standing to bring a VPPA claim because—according to the NBA—the disclosure of "something truthful" cannot amount to an intangible harm. JA.47. Somewhat surprisingly, this argument is foreclosed by *TransUnion*, the very case the NBA relies on to advance it.

*Second*, the NBA advanced a series of fact-bound arguments about whether (1) the alleged disclosures—caused by code the NBA chose to insert into its website—were somehow unintentional, (2) Mr. Salazar consented to the NBA's disclosures merely by navigating to or remaining on its website, and (3) Mr. Salazar waived his ability to bring class-action claims by navigating to or remaining on the

NBA's website. *See* JA.52–61. The district court did not address these arguments. *See* JA.211. It should be permitted to do so in the first instance on remand.

A.    **Mr. Salazar suffered a concrete injury-in-fact based on the disclosure of his private information.**

As to Article III standing, the NBA's argument proceeded in two steps. To begin, it argued *TransUnion* worked a sea-change in standing jurisprudence. JA.46 (arguing any reliance "on pre-*TransUnion* cases drawing broad-brush analogies to common-law privacy torts . . . should be rejected" because, "[w]hatever the state of the law may have been prior to *TransUnion*," that case "represents a significant 'change in standing doctrine'" (quoting *Faehner v. Webcollex, LLC*, No. 21-1734, 2022 WL 5000454, at *1 (2d Cir. Feb. 18, 2022)).[6] Then, the NBA claimed "[i]t is not 'traditionally recognized' that there is a legally cognizable injury-in-fact whenever one person communicates truthful information about another." JA.47. As such, the NBA believed Mr. Salazar lacked standing to bring his VPPA suit.

There is just one problem with the NBA's argument. It is squarely foreclosed by *TransUnion* itself. In that case, the Supreme Court was concerned with ensuring

_____

[6] In *Faehner*, this Court vacated a dismissal and remanded in a case brought under the Fair Debt Collection Practices Act (*i.e.*, a close analog to the Fair Credit Reporting Act, the statute confronted in *TransUnion*). It did so "to allow plaintiff an opportunity to replead her claims" and "to give the district court an opportunity to address any standing questions in the first instance" given "the change in standing doctrine that *TransUnion* has brought about." *Faehner*, 2022 WL 5000454, at *1. This Court did not describe *TransUnion* as working a "significant" change in standing jurisprudence. JA.46 (adding this term to the Court's mention of "change").

plaintiffs have a "personal stake" in their cases. *TransUnion*, 141 S. Ct. at 2203

(noting that "plaintiffs must be able to sufficiently answer the question: 'What's it to

you?'"). And the Court reiterated what it declared in *Spokeo v. Robins*, which is that

"courts should assess whether the alleged injury to the plaintiff has a 'close

relationship' to a harm 'traditionally' recognized as providing a basis for a lawsuit

in American courts." *TransUnion*, 141 S. Ct. at 2204 (quoting *Spokeo v. Robins*, 578

U.S. 330, 341 (2016)). It then noted that "traditional tangible harms, such as physical

harms and monetary harms," most obviously qualify as concrete injuries-in-fact. *Id.*

The Court then pivoted to the somewhat less obvious intangible harms that

qualify as concrete injuries-in-fact. There, it proclaimed:

> Various intangible harms can also be concrete. Chief among them are
> injuries with a close relationship to harms traditionally recognized as
> providing a basis for lawsuits in American courts. Those include, for
> example, reputational harms, *disclosure of private information*, and
> intrusion upon seclusion.

*Id.* (emphasis added; citations omitted). Thus, *TransUnion* itself recognized that one

whose private information has been disclosed without his consent has been

concretely harmed and has standing. *See id.* at 2204–05.

Whatever change, of whatever significance, *TransUnion* might have wrought

on standing jurisprudence, it clearly held that the "disclosure of private

information"—the *exact* harm involved in this case—counted as a concrete injury-

in-fact. Indeed, it held this injury was "[c]hief among" the kinds of intangible harms

traditionally recognized as providing a valid basis for suit. *Id.* at 2204. And there is no carveout for disclosures of "truthful" private information.

Because Mr. Salazar alleges the NBA disclosed his private information (*i.e.*, his video-watching history) without his consent, he suffered a concrete injury-in-fact. As to that element, Article III requires no more. Mr. Salazar has standing to pursue his VPPA claim.

**B.    The district court should address the NBA's remaining arguments in the first instance on remand.**

In general, "a federal appellate court does not consider an issue not passed upon below." *Singleton v. Wulff*, 428 U.S. 106, 120 (1976). There are narrow exceptions to this general rule. For example, an appellate court may decide a question in the first instance "where the proper resolution is beyond any doubt" or "where injustice might otherwise result." *Id.* at 121 (internal quotation marks and citations omitted). Similarly, it may do so when the issue is "purely legal." *United States v. Gomez*, 877 F.3d 76, 92 (2d Cir. 2017). Still, this Court's "general policy" is "that the trial court should consider arguments . . . in the first instance." *Ark. Tchr. Ret. Sys. v. Goldman Sachs Grp., Inc.*, 11 F.4th 138, 143 (2d Cir. 2021).

Here, the district court expressly declined to "reach [the NBA's] alternative arguments." JA.211. Those arguments are not "purely legal" and instead involve fact questions concerning the NBA's intent and Mr. Salazar's supposed consent to be bound by the NBA.com's Terms and Conditions. *See, e.g.*, *Meyer v. Uber Techs.,*

*Inc.*, 868 F.3d 66, 75–76 (2d Cir. 2017) (noting that browsewrap agreements—like the one the NBA deployed here—are valid only if the user has "actual or constructive knowledge of the website's terms and conditions," which, like notice issues more generally, "is clearly a fact-intensive inquiry"). Nor would permitting the district court to decide these issues result in any manifest injustice.

Accordingly, the district court should be permitted to address and resolve these issues—potentially on a more fully developed factual record—on remand.

## CONCLUSION

For the foregoing reasons, the order granting the NBA's motion to dismiss should be reversed. At the very least, the denial of leave to amend should be reversed.

Respectfully submitted,

*/s/ Joshua I. Hammack*
Joshua I. Hammack
Michael L. Murphy
BAILEY & GLASSER, LLP
1055 Thomas Jefferson Street, NW
Suite 540
Washington, DC 20007
(202) 463-2101

*Counsel for Appellant*

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

1. This brief complies with the type-volume limitation because:

   this brief contains <u>10,289</u> words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

   this brief has been prepared in a proportional spaced typeface using <u>Microsoft Word</u> in <u>14-point Times New Roman</u>.

This the 31st day of October 2023.

Respectfully submitted,

*/s/ Joshua I. Hammack*
Joshua I. Hammack
Michael L. Murphy
BAILEY & GLASSER, LLP
1055 Thomas Jefferson Street, NW
Suite 540
Washington, DC 20007
(202) 463-2101

*Counsel for Appellant*

**CERTIFICATE OF FILING AND SERVICE**

I hereby certify that on October 31, 2023, I electronically filed the foregoing with the Clerk of Court using the CM/ECF System, which will send notice of such filing to all registered CM/ECF users.

This the 31st day of October 2023.

Respectfully submitted,

*/s/ Joshua I. Hammack*
Joshua I. Hammack
Michael L. Murphy
BAILEY & GLASSER, LLP
1055 Thomas Jefferson Street, NW
Suite 540
Washington, DC  20007
(202) 463-2101

*Counsel for Appellant*