# 23-1147

## In The

# United States Court Of Appeals
## For The Second Circuit

### MICHAEL SALAZAR,
**individually and on behalf of all others similarly situated,**

*Plaintiff-Appellant,*

**v.**

### NATIONAL BASKETBALL ASSOCIATION,

*Defendant-Appellee.*

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK (NEW YORK CITY)
The Honorable Jennifer Louise Rochon, U.S. District Judge
NO. 0208-1 : 22-CV-7935**

_____

### REPLY BRIEF OF APPELLANT
_____

**Joshua I. Hammack
Michael L. Murphy
BAILEY & GLASSER, LLP
1055 Thomas Jefferson
Street, NW
Suite 540
Washington, DC 20007
(202) 463-2101**

*Counsel for Appellant*

# TABLE OF CONTENTS

**Page:**

TABLE OF AUTHORITIES ..................................................................................... iii

INTRODUCTION ................................................................................................ 1

ARGUMENT ...................................................................................................... 2

I.  Mr. Salazar Is a "Subscriber of Goods or Services from a Video Tape Service Provider." .................................................................. 3

   A.  The VPPA's definition of "consumer" unambiguously includes those who subscribe to *any* "goods or services from a video tape service provider." ................................... 4

      1.  Section 2710(a)(1)'s definition of "consumer" is unambiguous ............................................................... 5

      2.  No other statutory provision creates ambiguity ............... 7

      3.  No other feature of the VPPA creates ambiguity ........... 11

   B.  The VPPA's legislative history confirms Congress knew how to refer to video-specific materials when it wanted to do so .................................................................. 14

   C.  Even if "goods or services" is properly limited to "audio-visual materials," the newsletter at issue still qualifies ............ 20

   D.  Mr. Salazar should have been granted leave to amend ............ 22

   E.  The district court's rewrite sows ambiguity in the VPPA ......... 23

   F.  The VPPA does not exempt the Internet or contain a carveout for "target advertising." ........................................... 24

II.  This Court Cannot Avoid the Statutory Question ............................... 25

   A.  Mr. Salazar suffered a concrete injury-in-fact .......................... 26

   B.  Mr. Salazar alleged the NBA disclosed his information .......... 27

CONCLUSION ...................................................................................29

CERTIFICATE OF COMPLIANCE WITH RULE 32(a) ........................................30

CERTIFICATE OF FILING AND SERVICE.........................................................31

# TABLE OF AUTHORITIES

**Page(s):**

**Cases:**

*BedRoc Ltd., LLC v. United States*,
    541 U.S. 176 (2004)......................................................................................4, 5, 10

*Bohnak v. Marsh & McLennan Co.*,
    79 F.4th 276 (2d Cir. 2023)....................................................................26, 27

*Carter v. Scripps Networks, LLC*,
    --- F. Supp. 3d ----, No. 22-cv-02031, 2023 WL 3061858
    (S.D.N.Y. Apr. 24, 2023) ..................................................................................21

*DiPierre v. United States*,
    564 U.S. 70 (2011)..............................................................................................12

*Duncan v. Walker*,
    533 U.S. 167 (2001)..............................................................................................4

*Ellis v. Cartoon Network, Inc.*,
    803 F.3d 1251 (11th Cir. 2015)........................................................................22

*Fed. Hous. Fin. Agency v. UBS Ams. Inc.*,
    712 F.3d 136 (2d Cir. 2013)........................................................................5, 10

*Lamie v. U.S. Trustee*,
    540 U.S. 526 (2004)............................................................................................14

*Landgraf v. USI Film Prods.*,
    511 U.S. 244 (1994)..............................................................................................4

*Novak v. Kasaks*,
    216 F.3d 300 (2d Cir. 2000)............................................................................14

*Pa. Dep't of Corrs. v. Yeskey*,
    524 U.S. 206 (1998)....................................................................................13, 24

*Salazar v. Paramount Global*,
    No. 3:22-cv-00756, 2023 WL 4611819 (M.D. Tenn. July 18, 2023)............21

*TransUnion LLC v. Ramirez*,
    594 U.S. 413 (2021)........................................................................26

*United States v. Bedi*,
    15 F.4th 222 (2d Cir. 2021)..............................................................5

*United States v. Maria*,
    186 F.3d 65 (2d Cir. 1999)..............................................................10

*United States v. Pate*,
    84 F.4th 1196 (11th Cir. 2023)..........................................................8

*United States v. Ron Pair Enters., Inc.*,
    489 U.S. 235 (1989)..........................................................................4

*W. Va. Univ. Hosps., Inc. v. Casey*,
    499 U.S. 83 (1991)............................................................................4

*Xiao Ji Chen v. U.S. Dep't of Justice*,
    471 F.3d 315 (2d Cir. 2006)............................................................13

*Zuni Pub. Sch. Dist. No. 89 v. Dep't of Educ.*,
    550 U.S. 81 (2007)..........................................................................19

**Statutes:**

18 U.S.C. § 2710(a)(1)....................................................................*passim*

18 U.S.C. § 2710(a)(3)....................................................................*passim*

18 U.S.C. § 2710(a)(4)....................................................................*passim*

18 U.S.C. § 2710(b)(1)..........................................................................10

18 U.S.C. § 2710(b)(2)(B)................................................................24, 25

18 U.S.C. § 2710(b)(2)(D)(ii).....................................................1, 10, 11, 12

iv

**Rules:**

FED. R. CIV. P. 15(a)(2).................................................................................23

**Other Authorities:**

S. Rep. No. 100-599.............................................................................*passim*

## INTRODUCTION

When Congress said "goods or services" in 18 U.S.C. § 2710(a)(1), it meant "goods or services." Indeed, this Court must presume Congress said what it meant and meant what it said. Even setting aside that foundational presumption, however, the conclusion would be the same. When Congress intended to limit a term in the Video Privacy Protection Act ("VPPA") to video-specific materials, it used the word "video." It did so three separate times, elsewhere referring to "video materials and services," "video cassette tapes or similar audio visual materials," and "video tapes or other audio visual material." Congress's use of a broader, more inclusive term in Section 2710(a)(1) was intentional and should be respected.

The district court, however, decided Congress must not have meant what it said in Section 2710(a)(1). Although Congress said "goods or services," maybe it meant "audio visual materials"—a term it used in Section 2710(a)(4) and Section 2710(b)(2)(D)(ii), but *not* in Section 2710(a)(1). Or maybe it meant "audio-visual goods or services"—a term it never used. This judicial rewrite came with consequences. Although Mr. Salazar plainly subscribed to the NBA's newsletter (*i.e.*, a good or service), the court dismissed his claim because it believed the newsletter was not "audio visual material" or an "audio-visual good or service." Because a newsletter with curated links to the NBA's video content meets even the rewritten standard, that conclusion was wrong. More to the point, however, it was irrelevant.

1

Congress did not require Mr. Salazar to subscribe to "audio visual material" or an "audio-visual good or service" to be a statutory "consumer."

By the statute's plain language—what Congress actually enacted—Mr. Salazar was a "consumer." The district court's contrary conclusion, which hinged on a convoluted statutory rewrite, was wrong and should be reversed.

## ARGUMENT

The VPPA defines "consumer" to include a "subscriber of goods or services from a video tape service provider." 18 U.S.C. § 2710(a)(1). This appeal asks whether, when Congress said "goods or services," it meant "goods or services" or, instead, meant some variation of "audio-visual materials."[1] The parties disagree about that point. But they agree about three other issues.

*First*, the NBA is a "video tape service provider" ("VTSP"). *Id.* § 2710(a)(4). It has never argued otherwise. Merely proclaiming it "does not concede" this point, Response Brief [hereinafter "Resp."] at 43–44, changes nothing.

*Second*, the NBA disclosed "personally identifiable information" about Mr. Salazar. 18 U.S.C. § 2710(a)(3). Again, it has never argued otherwise.

*Third*, whether Mr. Salazar is a "consumer" hinges on his status as a "subscriber." He is not a "renter" or "purchaser." *Id.* § 2710(a)(1); JA.204.

---

[1] The district court used "audio visual materials" and "audio-visual goods or services" interchangeably. JA.206–09. Mr. Salazar does the same here.

2

Accordingly, this dispute is narrow. The only question is whether Mr. Salazar is a "subscriber" of the NBA's "goods or services." 18 U.S.C. § 2710(a)(1). Here, too, the parties agree about a lot.

To start, everyone agrees Mr. Salazar subscribes to the NBA's newsletter. Opening Br. at 17; Resp. at 3, 9, 11, 18, 48, 50. All agree those newsletters contain links to the NBA's video content. Resp. at 13–14, 18, 48, 50–51 (agreeing the newsletter "promotes [and] links to videos"). And everyone agrees the NBA delivered Mr. Salazar video content. Opening Br. at 17–18; Resp. at 3, 7, 9, 18, 43, 48, 51. These undisputed facts resolve the appeal.

## I.      Mr. Salazar Is a "Subscriber of Goods or Services from a Video Tape Service Provider."

The VPPA imposes three requirements before conferring "consumer" status on an individual:

> [T]he term "consumer" means any (1) renter, purchaser, or subscriber of (2) goods or services (3) from a video tape service provider.

18 U.S.C. § 2710(a)(1) (numerals added). Here, the first and third requirements are clearly satisfied. Mr. Salazar is a "subscriber" because he subscribed to the newsletter. And he received that newsletter "from a video tape service provider" (*i.e.*, the NBA). The only question is whether the newsletter is a "good or service." It is.

Accordingly, Mr. Salazar is a "subscriber" of the NBA's "goods or services." Because the law requires no more, he is also a statutory "consumer." To conclude otherwise, the district court rewrote the unambiguous statute.

> **A.    The VPPA's definition of "consumer" unambiguously includes those who subscribe to *any* "goods or services from a video tape service provider."**

Because this Court's "task is to construe what Congress has enacted," it must begin "with the language of the statute." *Duncan v. Walker*, 533 U.S. 167, 172 (2001); *see also United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 241 (1989) (similar); Opening Br. at 18 (collecting cases).

At this stage, the question is whether the statutory text is ambiguous. If not, it must be enforced according to its terms. *See BedRoc Ltd., LLC v. United States*, 541 U.S. 176, 183 (2004) ("[O]ur inquiry begins with the statutory text, and ends there as well if the text is unambiguous."); Opening Br. at 18 (collecting cases).

This familiar methodology is no surprise. After all, the language "adopted by both Houses of Congress and submitted to the President" is the "best evidence" of Congress's intent. *W. Va. Univ. Hosps., Inc. v. Casey*, 499 U.S. 83, 98 (1991), *superseded on other grounds as recognized by Landgraf v. USI Film Prods.*, 511 U.S. 244, 251 (1994). And an unambiguous law cannot be "expanded or contracted by the statements of individual legislators or committees during the course of the enactment process." *Id.* at 99.

As always, the Court may employ "all the textual and structural clues bearing on [a provision's] meaning" and should "constru[e] each word in its context and in light of the terms surrounding it." *United States v. Bedi*, 15 F.4th 222, 226 (2d Cir. 2021) (internal quotation marks, citations, and footnotes omitted). Any undefined term must be given its "ordinary meaning." *Fed. Hous. Fin. Agency v. UBS Ams. Inc.*, 712 F.3d 136, 141 (2d Cir. 2013). The goal is "to ascertain how a reasonable reader would understand the statutory text, considered as a whole." *Id.*

This Court must always presume that Congress "says in a statute what it means and means in a statute what it says there." *BedRoc*, 541 U.S. at 183. With these guiding principles in mind, Mr. Salazar turns to Section 2710(a)(1).

1. *Section 2710(a)(1)'s definition of "consumer" is unambiguous.*

Congress defined "consumer" to include "any . . . subscriber of goods or services from a video tape service provider." 18 U.S.C. § 2710(a)(1). Because it did not define the terms "goods" or "services," individually or together, their ordinary meanings apply. *See Fed. Hous. Fin. Agency*, 712 F.3d at 141; Opening Br. at 20.

No combination of the broad terms Congress enacted in Section 2710(a)(1)— individually or together—is ordinarily understood to mean only to audio-visual materials. The NBA does not argue otherwise. Nor could it. A "reasonable reader" would not interpret the term "goods or services" so narrowly. Instead, a "reasonable reader" would interpret Section 2710(a)(1) to include as consumers those who

5

subscribe to any "goods or services from a video tape service provider." 18 U.S.C. § 2710(a)(1). After all, that is what the statute says.

Thus, nothing about Section 2710(a)(1) supports the unnaturally narrow reading advanced by the NBA and adopted by the district court.[2] Instead, Section 2710(a)(1) unambiguously defines "consumer" to include a subscriber of an unrestricted category of "goods or services" from a particular kind of business. The NBA qualifies as that kind of business. Mr. Salazar is a subscriber. And the newsletter he subscribed to fits within the all-inclusive category of "goods or services." He thus meets every requirement of Section 2710(a)(1)'s plain language.

Put simply, Section 2710(a)(1) is not ambiguous. Nothing in its text suggests Congress intended the broad term "goods or services" to mean only audio-visual materials. For the district court's narrowing construction to survive, some other provision must render it ambiguous. Mr. Salazar turns next to that possibility.

---

[2] The NBA faults Mr. Salazar for pointing out that the term "goods or services . . . , by itself, is not ambiguous." Resp. at 32. If he had stopped there, the criticism might have some force. But he did not. Instead, he argued no "other term, phrase, or provision of the VPPA" created an ambiguity. Opening Br. at 22. And he examined the VPPA's "broader context" to confirm Congress's use of "goods or services" was intended to cover more than audio-visual materials. *See id.* at 22–26.

2.      *No other statutory provision creates ambiguity.*

Looking elsewhere in the VPPA does not render Section 2710(a)(1) ambiguous. Instead, several other provisions confirm that, when defining "consumer," Congress intentionally included more than audio-visual materials.

Consider, for example, that the definition of "consumer" includes subscribers of "goods or services from a video tape service provider." 18 U.S.C. § 2710(a)(1). The NBA believes the mere inclusion of "video tape service provider" in the definition means Congress was referring only to "goods or services of the sort that a 'video tape service provider' *as such* provides." Resp. at 30. Not so.

Congress did not limit its definition to "goods or services *of the sort that* a video tape service provider *as such provides*." *Id.* (emphases added to words not contained in the statute). Instead, it said "goods or services *from* a video tape service provider." 18 U.S.C. § 2710(a)(1) (emphasis added). A "reasonable reader" would take this simple formulation to include all goods or services, of whatever sort, from a video tape service provider. The NBA's preferred rewrite changes the provision's structure and meaning. And it inserts a limitation Congress did not enact.

Moreover, the NBA's rewrite ignores that Congress separately defined "video tape service provider." And it did *not* require such entities to provide exclusively audio-visual materials. *See* 18 U.S.C. § 2710(a)(4). Instead, it defined VTSPs to include any entity "engaged in the business . . . of rental, sale, or delivery of

prerecorded video cassette tapes or similar audio visual materials," 18 U.S.C. § 2710(a)(4), no matter what else it might offer. An entity does not stop being a VTSP merely because it offers some non-audio-visual materials, too. Accordingly, a "reasonable reader" would conclude a VTSP's "goods or services" include more than the narrow set of audio-visual materials mentioned elsewhere in the statute.

That Congress used language limited to audio-visual materials when defining "video tape service provider" but *not* when defining "consumer" suggests Section 2710(a)(1)'s broad language was no accident. Section 2710(a)(1)'s use of different terms suggests it was intended to include a broader category of materials than was captured by Section 2710(a)(4)'s narrow language. Indeed, as the Eleventh Circuit recently noted, "an entire 'family of canons' underscore that commonsense point":

> First, where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion. . . . Second, and relatedly, where Congress knows how to say something but chooses not to, its silence is controlling. Third, when Congress uses different language in similar sections, it intends different meanings. And finally, the capper: Congress' clear ability to modify a term . . . and the fact that it did not do so in the disputed phrase . . . signifies that it had no intention to so limit the term in [that] instance.

*United States v. Pate*, 84 F.4th 1196, 1202–03 (11th Cir. 2023) (en banc) (internal quotation marks, bracketed alterations, and citations omitted).

But Section 2710(a)(4)'s language is not even the clearest expression of Congress's intent. That distinction belongs to Section 2710(a)(3). There, Congress

defined "personally identifiable information" ("PII") with language again aimed at audio-visual materials—namely, "video materials or services from a video tape service provider." 18 U.S.C. § 2710(a)(3). This provision removes all doubt. When Congress intended to refer only to audio-visual materials, it knew how to do so.

But Section 2710(a)(3) is revealing for another reason. Like Section 2710(a)(1), it refers to certain content "from a video tape service provider." 18 U.S.C. § 2710(a)(1) (referring broadly to "goods or services from a [VTSP]"); *id.* § 2710(a)(3) (referring narrowly to "video materials or services from a [VTSP]"). That Congress used "goods or services" in one location and "video materials or services" in another confirms what that "family of canons" suggests.

Any "reasonable reader" would conclude the different terms conveyed different meanings. Congress knew VTSPs might offer "goods or services" beyond "video materials or services." And it knew how to refer to video-specific offerings when it wanted to do so. That it did not use such limiting language in Section 2710(a)(1), and instead used a much broader phrase, shows it had different materials in mind when it wrote that provision. Put simply, Congress used "goods or services" in Section 2710(a)(1) because it did not intend the definition of "consumer" to be limited in the way Section 2710(a)(3) was limited.

There is no grammatical reason for Congress to have used a broader term in Section 2710(a)(1) and a narrower term in Section 2710(a)(3). Resp. at 37–38

(arguing, unconvincingly, that Congress used different terms in Section 2710(a)(1) and Section 2710(b)(2)(D)(ii) because using the same terms be "verbally awkward and confusing"). There is every reason to believe Congress made an intentional decision about the scope of materials included in the definition of "consumer" versus the definition of "personally identifiable information." *See, e.g.*, *United States v. Maria*, 186 F.3d 65, 71 (2d Cir. 1999) (holding "the use of different words within the same statutory context strongly suggests that different meanings were intended"); Opening Br. at 24–25 (collecting cases).

That Congress used different terms in neighboring, grammatically aligned provisions is not merely "puzzling." Resp. at 34. It is dispositive. That Congress used narrower terms to refer specifically to audio-visual materials in at least three other VPPA provisions means it knew what it was doing when it used a broader term in Section 2710(a)(1). The narrower language of nearby provisions suggests "goods or services" was intentionally *not* limited to audio-visual materials. In each provision, Congress meant what it said and said what it meant. *See BedRoc*, 541 U.S. at 183; *UBS*, 712 F.3d at 141.[3]

That the liability provision refers to "any consumer of such provider," 18 U.S.C. § 2710(b)(1), bolsters this conclusion. This language, too, strongly suggests

---

[3] Mr. Salazar addresses the NBA's argument, based on legislative history, that Section 2710(a)(3)'s different language is unintentional in Part I.B.

Congress meant to include a broad category of consumers in the statute's scope, even as it prohibited only a narrow kind of disclosures about them.

### 3.   No other feature of the VPPA creates ambiguity.

There is no ambiguity based on the provision's plain text, terms in neighboring provisions, or the statute's broader context. It is unclear where else one should look. The NBA offers three possibilities. They make no difference.

*First*, the NBA points to the "suggestively parallel structure" of Sections 2710(a)(1) and 2710(a)(4). Resp. at 31. This argument fails for the simplest reason. Those provisions refer to different underlying materials—"goods or services" in the first instance and "prerecorded video cassette tapes or similar audio visual materials" in the second. Nothing about the statute's text, context, or structure suggests those two very different terms were intended to mean the same thing. Concluding otherwise would require this Court to assume Congress (1) did not mean what it said when it enacted these provisions, and (2) used wildly different terms to convey the same meaning. No "reasonable reader," assigning ordinary meaning, would conclude that "goods or services" means the same thing as "prerecorded video cassette tapes or similar audio visual materials."

In fact, the NBA concedes they do *not* mean the same thing. Resp. at 38 & n.10. It admits substituting "video tapes or other audio visual materials," from Section 2710(b)(2)(D)(ii), for "goods or services" in Section 2710(a)(1) would give

the provision a "significantly different meaning and scope." *Id.* at 38. But the former phrase—from Section 2710(b)(2)(D)(ii)—is practically identical to the phrase "prerecorded video cassette tapes or similar audio visual materials" in Section 2710(a)(4). As a result, substituting Section 2710(a)(4)'s language into Section 2710(a)(1) would have the same effect.

But that is precisely what the district court did. JA.206–09. It replaced Section 2710(a)(1)'s broad, all-inclusive language with Section 2710(a)(4)'s narrow, video-specific language. *Id.* This switcheroo gives Section 2710(a)(1) a "significantly different meaning and scope" than the language Congress enacted. Resp. at 38. Per the NBA, "certain video 'services' falling within the scope of 'goods or services from a video tape service provider' . . . fall outside the scope of the phrase 'video tapes or other audio visual materials." *Id.* at 38 n.10. There is no other way to put it: The NBA agrees the district court invented a limitation Congress did not enact.[4]

*Second*, the NBA attempts to narrow the definition of "consumer" by referring to the liability provision's title—"Video Tape Rental and Sale Records." Resp. at 32.

---

[4] This concession also eliminates any argument that the VPPA's narrow, video-focused terms fall within the realm of "marginal semantic divergence" with the broad term "goods or services." *DiPierre v. United States*, 564 U.S. 70, 83 (2011) (holding courts should not "place too much emphasis on the marginal semantic divergence" between terms because "Congress sometimes uses slightly different language to convey the same message"). There is nothing "marginal," "semantic," or "slight" about the differences between the narrow and broad terms Congress employed here. Indeed, the NBA agrees the terms are not interchangeable.

This effort falls just as flat. It is axiomatic that a statute's title "cannot limit the plain meaning of the text." *Pa. Dep't of Corrs. v. Yeskey*, 524 U.S. 206, 212 (1998) (citation omitted). Indeed, a title is useful "only when [it] shed[s] light on some ambiguous word or phrase." *Id.* (alterations in original); *see also Xiao Ji Chen v. U.S. Dep't of Justice*, 471 F.3d 315, 325 (2d Cir. 2006) (same). But there is no ambiguity here. And, while a title might remove an ambiguity, it cannot *create* one. That the liability provision itself immediately refers to three defined terms (*i.e.*, VTSP, PII, and "consumer") suggests its title sheds no light on those definitions.

*Third*, the NBA resorts to hyperbole. It proclaims "*everything* about the statute is focused exclusively on video materials offered by [VTSPs]." Resp. at 30 (emphasis altered). But the definition of "consumer" is not limited to "video materials." That other provisions focus narrowly on audio-visual materials, while Section 2710(a)(1) takes a broader focus, supports the conclusion that Congress used different language to convey different meanings.

That the statute's provisions are "intertwined," Resp. at 29, changes nothing. The VPPA's interconnected meaning is evident when one substitutes the definitions into the liability provision:

> A [person, engaged in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials] who knowingly discloses, to any person, [information which identifies a person as having requested or obtained specific video materials or services] concerning any [renter,

purchaser, or subscriber of goods or services] of such provider shall be liable to the aggrieved person for the relief provided in subsection (d).

Opening Br. at 29 (offering this visual).

By its terms, the VPPA prohibits a particular kind of business from disclosing a narrow set of information about a broad group of people. The NBA is that kind of business (*i.e.*, a VTSP). It disclosed the prohibited set of information (*i.e.*, PII) about Mr. Salazar. And he falls within that broad group of protected people (*i.e.*, "consumers") by virtue of his subscription to the NBA's "goods or services."

There is nothing "absurd" about this prohibition, the way Congress formulated it, or its application to this factual scenario. *See Lamie v. U.S. Trustee*, 540 U.S. 526, 534–36 (2004) (holding that, when a statute is unambiguous, "the sole function of the courts—at least where the disposition required by the text is not absurd—is to enforce it according to its terms"). The VPPA's unambiguous definition of "consumer" should be enforced as enacted.

### B. The VPPA's legislative history confirms Congress knew how to refer to video-specific materials when it wanted to do so.

Without an ambiguity, there is no need to turn to the VPPA's legislative history. *See Novak*, 216 F.3d at 310. But that history *confirms* Section 2710(a)(1)'s use of "goods or services" was intentional and meant to convey a different meaning than other terms included elsewhere in the VPPA.

14

The NBA admits legislative history "makes clear that Congress considered businesses engaged in multiple types of services." Resp. at 42; *see also* S. Rep. No. 100-599, at 12 (1988). In short, Congress knew VTSPs offered goods and services beyond videos. Thus, its decision to use narrow, video-specific terms in some provisions and broad, all-encompassing language in others was intentional.

The legislative history also confirms Congress was primarily concerned with disclosures of PII, *not* with individuals' precise relationships with VTSPs. *See* S. Rep. No. 100-599, at 1 (seeking "[t]o preserve personal privacy with respect to the rental, purchase or delivery of video tapes or similar audio visual materials," without mentioning "consumer" status); *id.* at 2 (explaining the VPPA "follows a long line of statutes . . . extend[ing] privacy protection to records that contain information about individuals," without mentioning "consumer" status); *id.* at 15 (explaining it intended "to protect [PII] from disclosure," without mentioning "consumer" status).

Congress was not shy about this broad goal. Perhaps no passage is more revealing than this one:

> The Act allows consumers to maintain control over personal information divulged and generated in exchange for receiving services from [VTSPs]. The Act reflects the central principle . . . that information collected for one purpose may not be used for another purpose without the individual's consent.

*Id.* at 8. Mr. Salazar fits neatly within this legislative purpose. He provided personal information so that he could receive the NBA's newsletter. JA.7–8, JA.12–13, JA.15,

JA.17, JA.19. The NBA paired that information with his viewing history and disclosed it to Facebook without his consent, all for the purpose of increasing revenue via targeted advertising. JA.10, JA.15, JA.17, JA.19–20, JA.23–24.[5]

The NBA claims it is "bizarre," "irrational," and "implausible" to believe Congress legislated with this possibility in mind. Resp. at 40–41. It is not. Indeed, the legislative history aligns with Section 2710(a)(1)'s text by defining "consumer" based on an individual's broad connection to a VTSP. *See* S. Rep. No. 100-599, at 16 (providing the VPPA "would prohibit [VTSPs] from disclosing [PII] concerning *consumers of such providers*" (emphasis added)).

The text and history suggest Congress understood VTSPs might create PII by combining information gleaned from video and non-video transactions. Opening Br. at 29–30 (providing an example of a provider pairing information from non-video transactions with an individual's history of viewing video content to create PII that would not have existed based solely on the delivery of the video-specific materials). Congress wrote the statute to prohibit disclosures of that information, even when stitched together from multiple transactions, just as it prohibits such disclosures when the information is generated solely by virtue of a video-specific transaction.

---

[5] The NBA's argument about "[t]he VPPA's manifest purpose," Resp. at 39–41, ignores the law's language and the Senate Report that sets forth the law's broad purpose to prevent disclosures of particular information.

In this respect, the statute prevents an anomalous result. It ensures VTSPs cannot disclose information that links individuals to specific video materials and services no matter how the providers came to possess such information. The NBA's interpretation would prohibit disclosures only if VTSPs obtained PII solely via video-related transactions. There is no reason to believe Congress cared more about how VTSPs came to possess PII than it did about PII being disclosed without consent. The NBA's reading also fails to account for Congress's concern for increasingly "sophisticated" and "pervasive form[s] of surveillance" that record "every transaction" and result in "intrusive data collection" that businesses might use "to better advertise their products." S. Rep. No. 100-599, at 7.[6]

The district court ignored these features of legislative history. It focused exclusively on the Senate Report's discussion of Section 2710(a)(3)—a different provision with different language. JA.207; Resp. at 42–43. But we do not need legislative history to tell us Congress intended to refer only to a VTSP's video-

---

[6] The NBA's hardware store example seems "remarkable," Resp. at 40–41, only because it is incomplete. It does not explain, for example, how the hardware store came to possess information that would link "casual website visitors" with particular video materials and services. *Id.* The example does not facially seem to pertain to whether an individual is a "consumer" of the hardware store at all. Instead, it emphasizes the unlikelihood the store would possess PII. If a casual website visitor also purchased a hammer, however, she would clearly be a "consumer" of the hardware store. And, if the store obtained her name and address from that hammer purchase and then paired it with her online video-watching history, it created PII that could not be disclosed without her consent.

related offerings when it defined PII. *Id.* The provision's language makes that reality clear by referring to "video materials or services." 18 U.S.C. § 2710(a)(3).

It is unclear what Congress's intent concerning Section 2710(a)(3), which uses video-specific language, tells us about its intent concerning Section 2710(a)(1), which does not use video-specific language. If anything, this history reveals Congress knew how to modify terms to express its will. When it intended to refer to video-related content, it inserted the word "video" into the definition. The NBA's complaint that "there is no indication Congress intended to sever the video- and non-video aspects of multifaceted businesses *only* with respect to the scope of covered PII, but not the scope of protected 'consumers,'" Resp. at 42, misses the mark. Indeed, that Congress used narrow, video-specific language when defining PII and not when defining "consumer" is the *best* evidence it intended the provisions to operate differently. *Casey*, 499 U.S. at 98.

Moreover, the Senate emphasized that Section 2710(a)(3) is unusual. *See* S. Rep. No. 100-599, at 12 (explaining it is "[u]nlike the other definitions" because it uses the term "includes" to "establish a minimum," rather than providing an exhaustive definition); *id.* (explaining "video" appears in this definition to "make[] clear that [PII] is intended to be transaction-oriented"—that is, to concern "information that identifies a particular person as having engaged in a specific transaction with a [VTSP]").

18

The notion that Section 2710(a)(3)'s narrow, transaction-oriented language means the same thing as Section 2710(a)(1)'s broad, all-encompassing language finds no support in this legislative history. Indeed, the district court's topsy-turvy analysis demonstrates the well-known dangers of judicial exegesis premised on legislative history. As Justice Scalia explained:

> [O]nce one departs from . . . the text . . . fidelity to the intent of Congress is a chancy thing. The only thing we know for certain both Houses of Congress (and the President, if he signed the legislation) agreed upon is the text. Legislative history can never produce a "pellucidly clear" picture of what a law was "intended" to mean, for the simple reason that it is never voted upon—or ordinarily even seen or heard—by the "intending" lawgiving entity, which consists of both Houses of Congress and the President (if he did not veto the bill). Thus, what judges believe Congress "meant" (apart from the text) has a disturbing but entirely unsurprising tendency to be whatever judges think Congress must have meant, *i.e.*, *should* have meant.
>
> \*         \*         \*
>
> The only sure indication of what Congress intended is what Congress enacted; and even if there is a difference between the two, the rule of law demands that the latter prevail. . . . We must interpret the law as Congress has written it, not as we would wish it to be.

*Zuni Pub. Sch. Dist. No. 89 v. Dep't of Educ.*, 550 U.S. 81, 116–17, 122 (2007) (Scalia, J., dissenting) (citations omitted).

In this case, the legislative history confirms what the text compels. The district court's distorted use of this legislative history to rewrite the statute's unambiguous text was "sheer applesauce." *Id.* at 113.

### C. Even if "goods or services" is properly limited to "audio-visual materials," the newsletter at issue still qualifies.

Now assume the district court correctly held Section 2710(a)(1)'s use of "goods or services" was intended to mean only "audio-visual goods or services" or "audio visual materials." JA.207. The next question is whether the subscribed-to newsletters meet that standard. Because the newsletters contain a curated list of video links, directed users to those videos, and "entice[d] or encourage[d] recipients to view [the NBA's] videos," JA.208–10, they meet even this unnaturally narrowed definition of "goods or services."

To conclude otherwise, the district court narrowed its own redefinition, holding that "audio-visual goods or services" really meant only the videos themselves. JA.208–09 (focusing on whether Mr. Salazar subscribed to "videos" or "video content"). The NBA repeats this clever sleight of hand. Resp. at 44 (referring to "video offerings"); *id.* at 48–52 (similarly narrowing the analysis to whether Mr. Salazar subscribed to "video content," "the videos he watched," or "the videos on the website"). This second rewrite reads "services" right out of the VPPA.

In any event, a newsletter that drives traffic to video content with curated links provides "enhanced access" to such content—*i.e.*, the thing the court claimed was important, JA.210—by making it easier and more convenient to view. Mr. Salazar did not access those videos "on equal footing with other website visitors who did *not* sign up for email newsletters," Resp. at 49, precisely because—unlike those

20

visitors—he received curated links to those videos in his inbox. And the relationship between the links and the videos is hardly "highly attenuated." Resp. at 15.[7]

In response to this straightforward analysis, the NBA advances two arguments. *First*, it complains Mr. Salazar discussed the newsletters' content "for the first time in a supplemental letter below." Resp. at 48, 51. But that timing is hardly surprising. The motion to dismiss was fully briefed in January 2023, JA.172—months before cases first reinterpreted "goods or services." *See Salazar v. Paramount Global*, No. 3:22-cv-00756, 2023 WL 4611819 (M.D. Tenn. July 18, 2023), *appeal filed*, No. 23-5748 (6th Cir. Aug. 21, 2023); *Carter v. Scripps Networks, LLC*, --- F. Supp. 3d ----, No. 22-cv-02031, 2023 WL 3061858 (S.D.N.Y. Apr. 24, 2023). Mr. Salazar did not "forfeit" an argument by raising it in a timely supplement, rather than predicting its relevance before those cases were decided.

In a supplement the district court considered, JA.196, JA.209–10, Mr. Salazar argued the newsletters met even the reimagined definition. JA.186–87 (the NBA raising *Paramount* and *Carter*); JA.188–89 (Mr. Salazar arguing the newsletter contained links to videos, directed subscribers to video content, and met the narrowed definition). There is no basis to conclude he forfeited this argument.

---

[7] The NBA's claim that the newsletters linked to "videos hosted on a separate website," Resp. at 51–52, is difficult to understand. Mr. Salazar subscribed to the newsletters on NBA.com, the same website that hosted the video content. The claim Mr. Salazar "never alleged . . . the email newsletter he received was related to his separate video-viewing activities on NBA.com," Resp. at 3, is false. He alleged he "used his NBA.com subscription to view Video Media through NBA.com." JA.10.

*Second*, the NBA suggests Mr. Salazar's argument that the newsletters qualify as "audio-visual goods or services" would "create an unfounded circuit split." Resp. at 50 (referring to *Ellis v. Cartoon Network, Inc.*, 803 F.3d 1251 (11th Cir. 2015)). Not so. *Ellis* addressed whether downloading an app without having "to provide any information" rendered one a "subscriber." *Ellis*, 803 F.3d at 1254–55. It never addressed whether the app was a "good or service." And it held that "subscription" required "some type of commitment, relationship, or association . . . between a person and an entity," *id.* at 1256, that was absent in that case, *see id.* at 1257.

Here, however, Mr. Salazar became a newsletter subscriber by providing his personal information, including his e-mail and IP addresses. JA.12–13, JA.19. He is a "subscriber." The only question is whether the newsletter is a "good or service" or, alternatively, an "audio-visual good or service"—questions *Ellis* never mentioned or considered, let alone resolved.

### D.    Mr. Salazar should have been granted leave to amend.

In his opening brief, Mr. Salazar explained why he should have been granted leave to file an amended complaint. Opening Br. at 33–35. In response, the NBA repeatedly emphasizes details the district court's rewrite rendered important that the initial complaint did not contain. Resp. at 9–11, 13, 48–49, 57–58. At the very least, though, the initial complaint and supplemental letters provided a "colorable basis" to conclude the newsletters "may" have met the redefined standard. Rule 15 requires

no more. Opening Br. at 33–34. The notion that Mr. Salazar could allege no set of facts whereby a newsletter with curated links to video content provided "enhanced access" to that content seems particularly misguided.

The NBA's position that plaintiffs must allege all facts in an initial complaint, including those rendered relevant by a judicial rewrite months later, finds no support in the Federal Rules. Indeed, the Rules favor amendment. FED. R. CIV. P. 15(a)(2).

### E. The district court's rewrite sows ambiguity in the VPPA.

The district court's narrowing construction of "goods or services" creates an ambiguity. Opening Br. at 35–36 (noting the rewrite created "near-perfect symmetry" between Sections 2710(a)(1) and 2710(a)(4)). This ambiguity assumes an interpretation that is "less faithful to Congress's language" and is not Mr. Salazar's preferred outcome. *Id.* at 36–37.

The NBA responds that the unintended consequences of the district court's rewrite "would make nonsense of the statute's structure," force the Court to interpret "subscriber" in a manner inconsistent with its ordinary meaning, and otherwise undermine Congress's intent. Resp. at 46–47. But these are reasons to avoid the statutory rewrite in the first place, not to ignore the resulting ambiguity. The Court can avoid the unintended consequences the NBA finds so grave by giving effect to the language Congress enacted in Section 2710(a)(1).

23

**F.    The VPPA does not exempt the Internet or contain a carveout for "target advertising."**

The Chamber of Commerce remarkably suggests the entire Internet is somehow exempt from the VPPA. Amicus at 3, 9, 12–15. As a fall back, it argues the VPPA cannot be used as "a *de facto* ban on targeted advertising." *Id.* at 9. These arguments suffer at least two fatal flaws.

*First*, the VPPA contains no "Internet" exemption. In fact, it mentions the Internet exactly once, permitting VTSPs to obtain consumers' consent "through an electronic means using the Internet." 18 U.S.C. § 2710(b)(2)(B). It is hard to imagine why Congress would spell out an Internet-based mechanism for consent if the entire Internet was beyond the VPPA's scope. That Congress did not modify the statute's definitions to mention the Internet when it set out to "amend[] the VPPA to account for modern technological realities," Amicus at 14–15, suggests those definitions already covered goods, services, and information exchanged on the Internet.

Moreover, "the fact that a statute can be applied in situations not expressly anticipated by Congress does not demonstrate ambiguity. It demonstrates breadth." *Yeskey*, 524 U.S. at 212. Congress enacted a statute with language broad enough to cover materials on the Internet. That language cannot be contorted into an Internet-wide exception. Indeed, that undertaking would be particularly absurd given that, from the beginning, Congress was concerned with privacy in the context of a "computer age" that "has revolutionized our world" in ways that could be "more

24

intrusive than ever before." S. Rep. No. 100-599, at 6; *see also id.* at 7 (discussing increasingly "sophisticated record-keeping systems" that might lead to "more . . . pervasive form[s] of surveillance"); *id.* at 7–8 (noting increasing vulnerabilities "with the growth of advanced information technology" because "[t]he computer makes possible the instant assembly of [a wide range of] information").

*Second*, the VPPA contains no carveout for disclosures that facilitate targeted advertising. And, although Congress did not mention it by name, the concept was hardly "science fiction" in 1988. Amicus at 12. Indeed, Congress considered how "new technologies" might "foster more intrusive data collection" and create greater "demands for . . . sensitive information," including because "[p]rivate commercial interests" want "to better advertise their products." S. Rep. No. 100-599, at 7.

In any event, the VPPA contains a solution to the Chamber's perceived problem—namely, consumer consent. *See* 18 U.S.C. § 2710(b)(2)(B). Faithful adherence to Congress's text would not doom targeted advertising. It would simply require businesses to obtain consent before engaging in the kinds of disclosures that support such advertising. There is nothing particularly harsh about that requirement.

## II.    This Court Cannot Avoid the Statutory Question.

Perhaps sensing the statutory rewrite is doomed, the NBA asks this Court to decide the case on unrelated grounds. Resp. at 19–27 (arguing Mr. Salazar lacks

standing); *id.* at 52–56 (arguing his browser, not the NBA, disclosed the PII). The Court should decline the invitation.[8]

### A.  Mr. Salazar suffered a concrete injury-in-fact.

Relying heavily on *TransUnion LLC v. Ramirez*, 594 U.S. 413 (2021), the NBA argues Mr. Salazar lacks standing because his injury—namely, disclosure of PII—is not sufficiently analogous to those suffered in common-law claims. Resp. at 19–27. *TransUnion* itself forecloses this argument. Opening Br. at 38–40 (noting *TransUnion* held the "disclosure of private information" was a concrete injury).

The NBA brushes aside this glaring problem by claiming *TransUnion* contained only a "passing statement that 'disclosure of private information' can, in some instances, be a legally cognizable harm." Resp. at 23. *TransUnion* was not so meek. It proclaimed "disclosure of private information" was "[c]hief among" the "injuries with a close relationship to harms traditionally recognized as providing a basis for lawsuits in American courts." *TransUnion*, 594 U.S. at 425.

This Court recently confirmed disclosing PII "to unauthorized third parties" has the requisite "close relationship" to the tort of public disclosure of private facts. *Bohnak v. Marsh & McLennan Co.*, 79 F.4th 276, 285–86 (2d Cir. 2023). Based on *TransUnion*'s language, it did not "stretch to reach this conclusion." *Id.* at 286. It

---

[8] The NBA agrees its other arguments below should be left for the district court to decide in the first instance. Resp. at 52 n.16.

explained that, while not "an exact duplicate," "the intangible harm arising from disclosure of one's PII bears a relationship to an injury with a close historical or common-law analogue." *Id.* (internal quotation marks and citation omitted); *id.* at 287 (holding there is a "close relationship between [a] data exposure injury and . . . public disclosure of private facts").[9]

The NBA's footnoted attempt to cast aside this holding, Resp. at 24 n.7, falls flat. *Bohnak* confirms disclosure of PII to an unauthorized third party is a concrete injury, particularly where that third party is likely to misuse the information. Here, the entire point was to misuse the "highly sought-after information" to create targeted advertising and enrich the NBA, Facebook, and other business partners. JA.8, JA.15–16, JA.19. The NBA's contention that this information may not have been "read" by Facebook and others, Resp. at 23, contradicts these allegations.[10]

## B. Mr. Salazar alleged the NBA disclosed his information.

In a last-ditch effort, the NBA argues Mr. Salazar alleges only that "his own computer," not the NBA, made the prohibited disclosures. Resp. at 53. It claims he failed to allege the NBA ever possessed the information at issue. *Id.* at 53–54. And

---

[9] *Bohnak* is particularly instructive because it involved an unintentional disclosure. 79 F.4th at 281 (noting an "unauthorized actor . . . leveraged a vulnerability in a third party's software" to obtain information).

[10] The NBA's citations to three FDCPA cases involving disclosures to intermediaries performing ministerial tasks—not entities that paid for PII intending to use it to generate profits—do not counsel a different result. Resp. at 21–23.

it argues it only *caused* the disclosure; it did not actually *disclose* anything. *Id.* at 54–56. The argument suffers at least two fatal flaws.

*First*, it contradicts or flatly ignores Mr. Salazar's allegations. For example, the NBA suggests Mr. Salazar's "computer . . . was configured to send such information to Facebook." Resp. at 53. But Mr. Salazar repeatedly alleged it was the NBA's choice to install invidious code on its website, not his computer's settings, that resulted in automatic disclosures. JA.8 ("Defendant shares . . . digital subscribers' unique [Facebook ID] and video content viewed . . . together as one data point to Facebook."); JA.9 (alleging that, because of the code the NBA installed, this disclosure is "automatic and invisible"); JA.12 ("Defendant . . . knowingly and systematically disclos[ed his] Personal Viewing Information to Facebook[.]"); JA.15 ("Defendant installed the Facebook tracking pixel[.] . . . NBA.com sends to Facebook the video content name, its URL, and . . . the viewers' Facebook ID."); JA.16 (similar); JA.18 (similar); JA.19 (similar).

Put simply, the NBA was no passive bystander. It installed code and ensured its website would systematically disclose users' PII. That Mr. Salazar might have been able to take some step to prevent disclosures, Resp. at 55, changes nothing.

*Second*, the argument hinges on a technical, fact-bound discussion of how, precisely, the code the NBA installed on its website operates to effectuate disclosures. Resp. at 53–54 (claiming the NBA does not "possess" PII gathered and

28

disclosed by the code). Those issues should be resolved by the district court in the first instance. Opening Br. at 40.

## CONCLUSION

This Court should reverse the order granting the NBA's motion to dismiss.

Respectfully submitted,

*/s/ Joshua I. Hammack*
Joshua I. Hammack
Michael L. Murphy
BAILEY & GLASSER, LLP
1055 Thomas Jefferson Street, NW
Suite 540
Washington, DC  20007
(202) 463-2101

*Counsel for Appellant*

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

1. This brief complies with the type-volume limitation because:

    this brief contains <u>6,992</u> words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

    this brief has been prepared in a proportional spaced typeface using <u>Microsoft Word</u> in <u>14-point Times New Roman</u>.

This the 2nd day of January 2024.

Respectfully submitted,

<u>/s/ Joshua I. Hammack</u>
Joshua I. Hammack
Michael L. Murphy
BAILEY & GLASSER, LLP
1055 Thomas Jefferson Street, NW
Suite 540
Washington, DC  20007
(202) 463-2101

*Counsel for Appellant*

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that on January 2, 2024, I electronically filed the foregoing with the Clerk of Court using the CM/ECF System, which will send notice of such filing to all registered CM/ECF users.

This the 2nd day of January 2024.

Respectfully submitted,

*/s/ Joshua I. Hammack*
Joshua I. Hammack
Michael L. Murphy
BAILEY & GLASSER, LLP
1055 Thomas Jefferson Street, NW
Suite 540
Washington, DC 20007
(202) 463-2101

*Counsel for Appellant*