# Vinson&Elkins

Hilary L. Preston  hpreston@velaw.com
**Tel** +1.212.237.0129  **Fax** +1.971.849.5342

February 23, 2024

**VIA CM/ECF**

Hon. Catherine O'Hagan Wolfe, Clerk
U.S. Court of Appeals
  for the Second Circuit
Thurgood Marshall U.S. Courthouse
40 Foley Square
New York, New York 10007

      Re:    *Salazar v. National Basketball Ass'n*, No. 23-1147 (case calendared for argument on April 2, 2024) – Federal Rule of Appellate Procedure Rule 28(j) Letter

Dear Ms. Wolfe:

      Defendant-Appellee National Basketball Association ("NBA") submits this letter to advise the Court of the Third Circuit's decision in *Barclift v. Keystone Credit Services, LLC*, No. 22-1925 (Feb. 16, 2024) (attached as Exhibit A).

      *Barclift* further solidifies the emerging circuit consensus that disclosure of true, non-misleading information about a plaintiff to a single legitimate business is insufficient to establish an Article III injury—a principle fatal to Mr. Salazar's standing here. *See* NBA Br. 19-27. The plaintiff in *Barclift* alleged that the defendant collection agency "invaded her privacy" by disclosing her private information to a vendor in violation of the Fair Debt Collection Practices Act ("FDCPA"). *Barclift*, slip op. at 3-4. Based on the Supreme Court's *TransUnion* decision and an analysis of relevant privacy torts, the Third Circuit held that the plaintiff lacked standing. *Id.* at 13-21. It thereby joined the Seventh, Tenth, and Eleventh Circuits in holding that mere disclosure of a plaintiff's private debt

---

**Vinson & Elkins LLP  Attorneys at Law**
Austin  Dallas  Dubai  Houston  London  Los Angeles
New York  Richmond  San Francisco  Tokyo  Washington

1114 Avenue of the Americas, 32nd Floor
New York, NY 10036
**Tel** +1.212.237.0000  **Fax** +1.212.237.0100  velaw.com



information to a single business is insufficient for standing under *TransUnion*.  *See generally id.* at 6-13; *accord* NBA Br. 21-24.[1]

Mr. Salazar suggests that this line of cases is distinguishable because they did not involve "entities that paid for [personally identifiable information ("PII")] intending to use it to generate profits."  Reply Br. 27 n.10.  Mr. Salazar does not attempt to explain this purported distinction's relevance to *TransUnion*'s injury-in-fact standards.  Regardless, the purported distinction is illusory.  Mr. Salazar has never alleged the NBA "paid" for the allegedly disclosed PII.  As for Mr. Salazar's reference to "profits," the FDCPA cases *did* involve revenue-generating activities, as *Barclift* confirms.  *See Barclift* slip op. at 2 (disclosure was part of "efforts to collect a debt").  The cases are materially indistinguishable for standing purposes.

Respectfully submitted,

*/s/ Hilary L. Preston*
Hilary L. Preston
VINSON & ELKINS LLP
1114 Avenue of the Americas
32nd Floor
New York, NY 10036
Phone: 212.237.0000
Email: hpreston@velaw.com

*Counsel for National Basketball Association*

cc:    All Counsel of record (via CM/ECF)

---

[1] Notably, *Barclift* distinguished cases involving data breaches by criminal hackers, which present the acute risk of "exposure of personally identifying information on the dark web"—a factual scenario worlds away from the facts of both this case and *Barclift* itself. *Barclift*, slip op. at 20 n.7 (internal quotation marks omitted); *accord* NBA Br. 24 n.7; *contra* Reply Br. 26-27.

## <u>CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT</u>

1.     This letter contains 345 words, excluding the parts of the letter exempted by Federal Rule of Appellate Procedure 32(f).

2.     This letter complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Office 365 in 14-point Times New Roman font.

*/s/ Hilary L. Preston*
Hilary L. Preston
VINSON & ELKINS LLP
1114 Avenue of the Americas
32nd Floor
New York, NY 10036
Phone: 212.237.0000
Email: hpreston@velaw.com

*Counsel for National Basketball Association*

## <u>CERTIFICATE OF SERVICE</u>

Pursuant to Rule 25 of the Federal Rules of Appellate Procedure, I hereby certify that, on February 23, 2024, I electronically filed the foregoing letter with the Clerk of the Court for the U.S. Court of Appeals for the Second Circuit using the appellate CM/ECF system. All participants in the case are registered CM/ECF users and service will be accomplished by that system.

*/s/ Hilary L. Preston*
Hilary L. Preston
VINSON & ELKINS LLP
1114 Avenue of the Americas
32nd Floor
New York, NY 10036
Phone: 212.237.0000
Email: hpreston@velaw.com

*Counsel for National Basketball Association*

# EXHIBIT A

**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 22-1925
_____

PAULETTE BARCLIFT,
On behalf of herself and others similarly situated,
                                                    Appellant

v.

KEYSTONE CREDIT SERVICES, LLC
_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Civil No. 5-21-cv-04335)
District Judge: Honorable Joseph F. Leeson, Jr.
_____

Argued on March 30, 2023

Before: MATEY, FREEMAN, and FUENTES,
*Circuit Judges*

(Opinion filed: February 16, 2024)

Jesse S. Johnson    **[ARGUED]**
Greenwald Davidson Radbil PLLC
5550 Glades Road, Suite 500
Boca Raton, FL 33431

Eric J. Landes
Landes Law, LLC
419 Oaktree Court
Sanatoga, PA 19464
       *Counsel for Appellant*


Lee J. Janiczek    **[ARGUED]**
Lewis Brisbois Bisgaard & Smith LLP
550 E Swedesford Road, Suite 270
Wayne, PA 19087
       *Counsel for Appellee*


————————

## OPINION OF THE COURT
————————


FREEMAN, *Circuit Judge*.

       To facilitate its efforts to collect a debt, Keystone Credit Services, LLC ("Keystone") sent Paulette Barclift's personal information to a mailing vendor, RevSpring, which then mailed Keystone's collection notice to Barclift. Barclift did not authorize Keystone's communications to RevSpring. So she sued Keystone for an unauthorized communication with a

third party in violation of the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692 *et seq.*, and she sought to represent a class of similarly situated plaintiffs. The District Court found that Barclift did not allege an injury sufficient to establish standing for purposes of Article III of the United States Constitution and dismissed her suit with prejudice. We agree that Barclift lacks standing, but we will modify the District Court's order so that the dismissal will be without prejudice.

# I

Keystone is a collection agency based in Lancaster, Pennsylvania.[1] It contracts with RevSpring to print and mail debt collection notices. RevSpring is a nationwide operation with multiple locations and hundreds of employees.

In October 2020, Barclift received a notice in the mail from Keystone regarding her outstanding debt for medical services. The notice was printed and mailed by RevSpring to Barclift's home in Pennsylvania. Keystone provided RevSpring with Barclift's name, address, debt balance, and other information about the debt to populate the mailing. Barclift did not give Keystone prior consent to share that information.

In October 2021, Barclift filed a class action complaint against Keystone on behalf of herself and other Pennsylvania residents who had received collection notices from Keystone through third-party mailing vendors. She claimed that Keystone violated the provision of the FDCPA that bars debt collectors from communicating with third parties in connection with a

---

[1] We recount the facts as alleged in Barclift's complaint.

debt absent prior consent from the debtor (or absent exceptions that do not apply here). 15 U.S.C. § 1692c(b). She alleged that the disclosures had caused her embarrassment and stress, invaded her privacy, and inflicted reputational harm.

Keystone moved to dismiss the complaint for failure to state a claim. The District Court did not reach that argument because it concluded that it lacked jurisdiction, so it dismissed the action without prejudice on that basis and denied Keystone's motion as moot. In its opinion, the court assumed that Barclift had alleged a procedural violation of the FDCPA based on Keystone's communication with RevSpring, but it held that Barclift had not alleged a concrete injury sufficient to establish standing.

Barclift subsequently amended her complaint by adding allegations about RevSpring's operations and data collection processes. Specifically, she made several allegations "upon information and belief," including that RevSpring maintains electronic copies of the consumer data it receives from debt collectors for multiple years, during which time its employees can access sensitive information. She also alleged that RevSpring had mistakenly disseminated the personal information of more than 1,000 patients in the University of Pennsylvania Health System in 2014.

Keystone again moved to dismiss the complaint for failure to state a claim, and the District Court again concluded that Barclift lacked standing. It held that the mere possibility of public disclosure of private facts was not enough to establish a concrete injury and that her fear of future disclosure was too speculative. This time, it dismissed the action with prejudice, reasoning that any additional amendments would be futile

4

because Barclift had not cured her claim's deficiencies when given the opportunity to do so.

Barclift timely appealed.

## II

We have jurisdiction over the District Court's order pursuant to 28 U.S.C. § 1291. We exercise *de novo* review of a dismissal for a lack of standing, "accepting the facts alleged in the complaint as true and construing the complaint in the light most favorable to the non-moving party." *Potter v. Cozen & O'Connor*, 46 F.4th 148, 153 (3d Cir. 2022).

## III

Article III of the Constitution grants federal courts "judicial Power" to resolve "Cases" and "Controversies." U.S. Const. art. III, §§ 1–2. The doctrine of standing ensures that courts do not overstep their role by "limit[ing] the category of litigants empowered to maintain a lawsuit in federal court to seek redress for a legal wrong." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). Plaintiffs seeking to vindicate their rights in federal court must therefore satisfy Article III's standing requirements. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992); *Finkelman v. Nat'l Football League*, 877 F.3d 504, 511 (3d Cir. 2017). Standing consists of three main components: (1) an injury in fact that is concrete and particularized, (2) a causal connection between the injury and the challenged conduct, and (3) a likelihood that the injury will be redressed by a favorable judicial decision. *In re Horizon Healthcare Servs. Inc. Data Breach Litig.*, 846 F.3d 625, 633 (3d Cir. 2017) (quoting *Lujan*, 504 U.S. at 560). Only the first component is at issue in this appeal: whether Keystone's alleged violation of

5

the FDCPA resulted in a concrete and particularized injury to Barclift.

## A

Congress enacted the FDCPA in 1977 to "eliminate abusive debt collection practices by debt collectors" that had contributed to "personal bankruptcies, to marital instability, to the loss of jobs, and to invasions of individual privacy." 15 U.S.C. §§ 1692(a), (e). To that end, section 1692c(b) prohibits debt collectors from "communicat[ing], in connection with the collection of any debt, with any person other than the consumer, his attorney, a consumer reporting agency if otherwise permitted by law, the creditor, the attorney of the creditor, or the attorney of the debt collector" "without the prior consent of the consumer." 15 U.S.C. § 1692c(b). And it creates a civil cause of action for any individual who sustains damages due to a debt collector's violation of the Act. 15 U.S.C. § 1692k.

For decades following the enactment of the FDCPA, consumers rarely sued over the use of third-party mailing vendors for debt collection practices. But in 2021, the United States Court of Appeals for the Eleventh Circuit held that consumers have standing under the FDCPA to bring so-called "mailing vendor theory" lawsuits. *Hunstein v. Preferred Collection & Mgmt. Servs., Inc.*, 994 F.3d 1341, 1344 (11th Cir. 2021) ("*Hunstein I*"), *vacated*, 48 F.4th 1236 (11th Cir. 2022) (en banc). In *Hunstein I*, the plaintiff alleged that a collection agency had sent his personal information to a mailing vendor to facilitate debt collection efforts. *Id.* at 1345. On the issue of Article III standing, the Eleventh Circuit considered *Spokeo, Inc. v. Robins*, in which the Supreme Court held that "a plaintiff [does not] automatically satisf[y] the injury-in-fact requirement whenever a statute grants a person a statutory right

6

and purports to authorize [a suit] to vindicate [it]" because "Article III standing requires a concrete injury even in the context of a statutory violation." 578 U.S. at 341. Applying *Spokeo*'s guidance, the Eleventh Circuit held that the injury Hunstein alleged was intangible but was nonetheless sufficiently concrete for Article III standing. *Hunstein I*, 994 F.3d at 1344, 1346. The court also concluded that Hunstein's allegations constituted a violation of section 1692c(b). *Id.* at 1344. That since-vacated decision led to a proliferation of similar suits across the country. *See, e.g.*, *In re FDCPA Mailing Vendor Cases*, 551 F. Supp. 3d 57, 63 (E.D.N.Y. 2021) ("Each case addressed herein invokes a recently-developed 'mailing-vendor' theory . . . . These cases emanate from [*Hunstein I*]."); *Jackin v. Enhanced Recovery Co.*, 606 F. Supp. 3d 1031, 1034–35 (E.D. Wash. 2022).

Just two months after *Hunstein I*, the Supreme Court decided *TransUnion LLC v. Ramirez*, 594 U.S. 413 (2021), which built upon *Spokeo* and provided additional guidance to courts seeking to determine whether an intangible harm suffices as a concrete injury. Because *TransUnion* is key to our decision today, we examine it in some detail here.

*TransUnion* was a class action suit seeking relief for individuals allegedly harmed by a violation of the Fair Credit Reporting Act ("FCRA"). A credit reporting agency mistakenly added an alert to numerous consumers' files indicating that they were a "potential match" with individuals on a national security threat list. *Id.* at 420. For most of the affected consumers, the credit agency simply maintained alerts on internal records without disseminating them. *Id.* at 421. But for others, the agency distributed reports containing the erroneous security alert to creditors. *Id.*

7

Invoking *Spokeo*, the Court explained that intangible harms can give rise to concrete injuries when they bear "a close relationship to harms traditionally recognized as providing a basis for lawsuits in American courts," such as "reputational harms, disclosure of private information, and intrusion upon seclusion." *Id.* at 425. But even though this inquiry requires the identification of "a close historical or common-law analogue for the[] asserted injury," the Court clarified that there need not be "an exact duplicate." *Id.* at 424. And while Congress may elevate certain harms to actionable legal status through legislation, the Court stressed that Congress's mere creation of a statutory cause of action does not "automatically satisf[y] the injury-in-fact requirement." *Id.* at 426 (quoting *Spokeo*, 578 U.S. at 341).

The *TransUnion* plaintiffs had sued, in relevant part, under a FCRA provision that requires agencies to "follow reasonable procedures to assure maximum possible accuracy of the [consumer's] information." 15 U.S.C. § 1681e(b). The plaintiffs contended that the erroneous security alerts bore a "close relationship" to the traditional harm associated with the tort of defamation. *TransUnion*, 594 U.S. at 432. The credit agency countered by arguing that defamation required literal falsity, whereas the alerts (which only denoted "*potential* match[es]" with the threats list) were at most misleading. *Id.* at 433.

The Supreme Court sided with the plaintiffs, explaining that—in the context of a national security threats list—"the harm from a misleading statement . . . b[ore] a *sufficiently close relationship* to the harm from a false and defamatory statement." *Id.* (emphasis added). But because publication is "essential to liability" in a defamation claim, only the plaintiffs whose

erroneous security alerts were actually disseminated to creditors suffered concrete injuries for standing purposes. *Id.* at 434 (quoting Restatement (Second) of Torts § 577 cmt. a (1938)). By contrast, the remaining plaintiffs, whose alerts were never sent to third parties, lacked standing to sue. *Id.* ("The mere presence of an inaccuracy in an internal credit file, if it is not disclosed to a third party, causes no concrete harm."), 437 ("[T]he [other] plaintiffs did not demonstrate that the risk of future harm materialized . . . . Nor did those plaintiffs present evidence that [they] were independently harmed by their exposure to the risk itself[.]").

In a footnote, the Court noted that the plaintiffs had forfeited an argument that the credit agency had "'published' the class members' information internally . . . to employees within TransUnion and to the vendors that printed and sent the mailings that the class members received." *Id.* at 434 n.6. In any event, the Court deemed the argument "unavailing" because "[m]any American courts did not traditionally recognize intra-company disclosures . . . for purposes of the tort of defamation" and did not "necessarily recognize[] disclosures to printing vendors as actionable publications." *Id.* And even the courts that traditionally did so required a showing that the defendant "actually 'brought an idea to the perception of another'" or that the information "was actually read and not merely processed." *Id.* (quoting Restatement (Second) of Torts § 559 cmt. a); *see id.* (explaining that a theory that "circumvents a fundamental requirement of an ordinary defamation claim . . . does not bear a sufficiently 'close relationship' to the traditional defamation tort to qualify for Article III standing").

Courts have interpreted *TransUnion*'s methodology in different ways, as exemplified by the subsequent developments

in the *Hunstein* matter. The Eleventh Circuit reheard *Hunstein* twice (first before the original panel ("*Hunstein II*"), and then *en banc*) before concluding that Hunstein's alleged harm in his mailing vendor case was not a concrete injury. *Hunstein v. Preferred Collection & Mgmt. Servs., Inc.*, 48 F.4th 1236, 1240 (11th Cir. 2022) (en banc) ("*Hunstein III*"). The *en banc* court focused on elements. It reasoned that an alleged intangible harm is not closely related to a traditional harm if it is "missing an element 'essential to liability' under the comparator tort." *Id.* at 1242. It then compared Hunstein's alleged injury to the traditional tort of public disclosure of private facts. It recounted that Hunstein did not suggest in his complaint that the debt collector's communication "reached, or was sure to reach, the public. Quite the opposite—the complaint describe[d] a disclosure that reached a single intermediary, which then passed the information back to Hunstein without sharing it more broadly." *Id.* at 1248. So the court held that Hunstein's allegations lacked publicity—an element "essential to liability." *Id.* at 1244.

The *Hunstein III* dissent, however, took issue with the majority's "element-for-element" approach. *Id.* at 1261 (Newsom, J., dissenting). The four dissenting judges viewed that approach as a "dressed-up version of the very 'exact duplicate' standard that the Supreme Court . . . flatly disavowed." *Id.* They reasoned that, because *TransUnion* held that misleading information was "close enough" to false and defamatory information, Hunstein's "allegation of *near* publicity[,] . . . (*i.e.*, dissemination to an as-yet-unknown number of employees)" was "close enough" to an allegation of publicity. *Id.* at 1262.

10

As an alternative to comparing elements, the *Hunstein III* dissent embraced a "*kind* of harm" test, which would require a plaintiff suing on a statutory cause of action to "show that his alleged injury is similar in *kind* to the harm addressed by a common-law cause of action, but not that it is identical in *degree*." *Id.* at 1264. On that basis, the dissenting judges would have concluded that Hunstein's allegations (taken as true and paired with all reasonable and favorable inferences) were sufficient to show an injury in fact because Hunstein's injury was "close enough" to the *kind* of harm posed by publicity under the common-law tort of public disclosure of private facts, even if Hunstein's harm did not rise to the same *degree* of publicity-related harm. *Id.* at 1268–69.

A few months after *Hunstein III*, the Tenth Circuit considered the FDCPA mailing vendor theory in *Shields v. Professional Bureau of Collections of Maryland, Inc.*, 55 F.4th 823 (10th Cir. 2022). The Tenth Circuit implicitly adopted the kind-of-harm framework urged by the *Hunstein III* dissent, but held that the plaintiff lacked standing. *Shields*, 55 F.4th at 829. It stated that under *TransUnion*, "Shields did not have to plead and prove the [common law] tort's elements to prevail. But to proceed, she had to at least allege a similar harm." *Id.* The court concluded that Shields's assertion "that one private entity (and, presumably, some of its employees) knew of her debt" was "not the same kind of harm as *public* disclosure of private facts." *Id.*

After we heard oral argument in Barclift's appeal, the Seventh Circuit took a turn at deciding a FDCPA mailing vendor case. *Nabozny v. Optio Sols. LLC*, 84 F.4th 731 (7th Cir. 2023). It first used the element-based approach from *Hunstein III* and held that the plaintiff's "attempt to analogize her case to [the

11

tort of public disclosure of private facts] [fell] apart on the threshold element of publicity." *Id.* at 735 (citing *Hunstein III*, 48 F.4th at 1245–49). Because the plaintiff did not allege publicity as that term is understood in traditional tort law, the court concluded that she had not suffered an injury "analogous to the harm at the core of the public-disclosure tort." *Id.* at 736; *id.* at 735 ("'Publicity' . . . means that the matter is made public, by communicating it to the public at large, or to so many persons that the matter must be regarded as substantially certain to become one of public knowledge." (quoting Restatement (Second) of Torts § 652D cmt. a)). The Seventh Circuit then addressed the kind-or-degree question, stating that the difference between public and private communication "is not just a matter of numbers," but when a private communication is sent "with no expectation of further disclosure, it is not one that is 'sure to reach[] the public.'" *Id.* at 736 (alteration in original) (quoting Restatement (Second) of Torts § 652D cmt. a). Finally, it explained that "the harm at the core of the public-disclosure tort" is "the humiliation that accompanies the disclosure of sensitive or scandalizing private information to public scrutiny." *Id.* So "[w]ithout a public-exposure component," the plaintiff's alleged harm was not analogous. *Id.*

In sum, judges on our sister circuits have interpreted *TransUnion* in two different ways. Some espouse an element-based approach, wherein a plaintiff's alleged harm must not lack any element of the comparator tort that was essential to liability at common law. *E.g.*, *Hunstein III*, 48 F.4th at 1244–45; *see* Element, *Black's Law Dictionary* (11th ed. 2019) (defining "element" as "[a] constituent part of a claim that must be proved for the claim to succeed"). Others compare the kind of harm a plaintiff alleges with the kind of harm caused by the

12

comparator tort. *E.g.*, *Shields*, 55 F.4th at 829. We view the second method as more faithful to *TransUnion*.

To determine the "concreteness" of intangible injuries, *TransUnion* instructs us to ask "whether the asserted harm has a 'close relationship' to a harm traditionally recognized as providing a basis for a lawsuit in American courts—such as physical harm, monetary harm, or various intangible harms including (as relevant here) reputational harm." 594 U.S. at 417. *TransUnion* speaks only of harms, not elements. Indeed, the word "element" does not appear once in the body of the *TransUnion* opinion. We believe that if the Court wanted us to compare elements, it would have simply said so.[2] So when asking whether a plaintiff's intangible injury is "concrete," we will examine the kind of harm at issue.

## B

Applying our interpretation of *TransUnion* to Barclift's allegations, we conclude that she cannot establish standing for her claim. She cannot demonstrate that the injury resulting from Keystone's communication of her personal information to a third-party mailing vendor bears a close relationship to a harm

---

[2] It has done so in other contexts. *See, e.g.*, *United States v. Dixon*, 509 U.S. 688, 696–97 (1993) (referring to the *Blockburger* test for double jeopardy as a "same-elements test" (citing *Blockburger v. United States*, 284 U.S. 299, 304 (1932))); *cf. Descamps v. United States*, 570 U.S. 254, 260–61 (2013) (describing the "categorical approach" to determining whether a state crime qualifies for a federal sentencing enhancement, which requires courts to ask whether the state crime "has the same elements as the 'generic' [federal] crime").

13

traditionally recognized by American courts. *See TransUnion*, 594 U.S. at 417.

At common law, actionable invasions of privacy are typically categorized into four separate torts: intrusion upon seclusion, appropriation of name or likeness, unreasonable publicity given to another's private life, and false light. *See* Restatement (Second) of Torts § 652A; *see also Nabozny*, 84 F.4th at 735. The traditional harm that Barclift analogizes to lies at the heart of the unreasonable publicity given to another's private life, which is also known as the public disclosure of private information.[3] A defendant is liable under this tort when he "gives publicity to a matter concerning the private life of another . . . if the matter publicized is of a kind that (a) would

---

[3] The dissent accepts Barclift's argument that "breach of confidence" is also a common-law analogue for her alleged harm. Dissenting Op. at 15–16 & n.13. But we hesitate to conclude that the harm associated with a breach of confidence bears a "close relationship to a harm traditionally recognized as providing a basis for a lawsuit in American courts." *TransUnion*, 594 U.S. at 440. As Vickery (cited by Barclift and the dissent) writes, breach of confidence law in the United States is not a "traditional theor[y] of liability"—rather, it was "emerging" and "still rudimentary" in the 1980s. Alan B. Vickery, *Breach of Confidence: An Emerging Tort*, 82 Colum. L. Rev. 1426, 1426, 1451 (1982). Although it was mentioned in some texts much earlier, it "died out in its infancy," likely due to the "birth and explosive growth" of traditional privacy torts such as the public disclosure of private facts. *Id.* at 1454–55; *see Young v. U.S. Dep't of Just.*, 882 F.2d 633, 640 (2d Cir. 1989) (describing breach of confidence as "a relative newcomer to the tort family").

14

be highly offensive to a reasonable person, and (b) is not of legitimate concern to the public." Restatement (Second) of Torts § 652D. The harm caused by this tort is "the humiliation that accompanies the disclosure of sensitive or scandalizing private information to public scrutiny." *Nabozny*, 84 F.4th at 736; *see also Jenkins v. Dell Publ'g Co.*, 251 F.2d 447, 450 (3d Cir. 1958) (explaining that privacy torts provide legal relief for "the embarrassment, humiliation[,] or other injury which may result from public disclosure concerning his personality or experiences"). The harm stems from both the offensive character of the information and its disclosure to the public.

Here, Barclift alleged that Keystone transmitted her information to RevSpring for one purpose: "to fashion, print, and mail debt collection letters." Appx. 39. She also alleged that she was "embarrassed and distressed" by the disclosure to RevSpring. Appx. 46. But she did not allege that anyone outside of Keystone or RevSpring accessed her personal information. In short, she alleged that Keystone transmitted her personal information to "a single ministerial intermediary," *Nabozny*, 84 F.4th at 736, causing her embarrassment.

While Barclift does not need to "exact[ly] duplicate" a traditionally recognized harm, *TransUnion*, 594 U.S. at 433, she must still analogize to a harm "of the same character of previously existing 'legally cognizable injuries,'" *Kamal v. J. Crew Grp., Inc.*, 918 F.3d 102, 114 (3d Cir. 2019) (quoting *Susinno v. Work Out World Inc.*, 862 F.3d 346, 352 (3d Cir. 2017)). Like our sister circuits, we conclude that the harm from disclosures that remain functionally internal are not closely related to those stemming from public ones. *See Shields*, 55 F.4th at 829 ("Shields's alleged harm was that one private entity (and, presumably, some of its employees) knew of her

debt.  That is not the same kind of harm as *public* disclosure of private facts, which is concerned with highly offensive information being widely known.").  When the communication of personal information only occurs between a debt collector and an intermediary tasked with contacting the consumer, the consumer has not suffered the kind of privacy harm traditionally associated with public disclosure.[4]

Our conclusion comports with the Supreme Court's observations (in dicta) from *TransUnion* about the internal publication of consumer data.  While *TransUnion* compared FCRA violations to the traditional harms of defamation, the same logic applies here.  The Court found unavailing plaintiffs' unpreserved argument that their information had been "published . . . internally . . . to employees within [the credit reporting agency] and to the vendors that printed and sent the mailings that the class members received."  *TransUnion*, 594 U.S. at 434 n.6 (quotation marks omitted).  The Court stated that American courts generally have not recognized "disclosures to printing vendors as actionable publications," and that harms associated with "internal publication . . . do[] not bear a

---

[4] We acknowledge that there is overlap between the nature of the traditional harm (humiliation stemming from the public disclosure of offensive information) and an element of the traditional tort (publicity).  This is because a disclosure that remains nonpublic is unlikely to result in the type of humiliation associated with the traditional injury.  Despite this overlap, and in accordance with the Supreme Court's directive in *TransUnion*, we focus our inquiry solely on the harm.  And even though that inquiry necessarily considers whether a disclosure is "public" (for lack of a better term), our approach is not an exercise in element-matching.

16

sufficiently 'close relationship'" to defamation harms for standing purposes. *Id.* While this rationale is not binding, we believe it would apply to the mailing vendor theory claims here.[5] If there are no grounds to believe that the information

_____

[5] Indeed, numerous early twentieth century courts held that communications to an associate in the ordinary course of business did not support an action at common law. For example, in *Chalkley v. Atlantic Coast Line Railroad Co.*, 143 S.E. 631 (Va. 1928), the Supreme Court of Virginia observed that

> in many cases the modern and more liberal rule is applied, *i.e.*, that where the communication of the libelous matter to the plaintiff is in the customary and usual course of the business of the defendant, in the discharge of an ordinary business duty, and is merely dictated to a stenographer, or copyist, who is charged with the duty of transcribing it, this is not such a publication of the alleged libel as will support an action.

143 S.E. at 638. *See also Globe Furniture Co. v. Wright*, 265 F. 873, 874–76 (D.C. Cir. 1920) (collecting cases); *Beck v. Oden*, 13 S.E.2d 468, 471 (Ga. Ct. App. 1941) ("The more liberal rule, and the one which seemingly has the support of the weight of modern authority, is that, where the communication is made to a servant or business associate in the ordinary or natural course of business, there is no actionable libel."); *Rodgers v. Wise*, 7 S.E.2d 517, 519 (S.C. 1940) ("This case seems to me to set out the sounder and more logical view [that] where a letter is dictated by a business man to his stenographer," the "cause of

(*continued on next page*)

17

action . . . fail[s] as a matter of law to allege a publication of the slanderous and libelous statements[.]"); *Cartwright-Caps Co. v. Fischel & Kaufman*, 74 So. 278, 279–80 (Miss. 1917) ("It is inconceivable how the business of the country . . . can be carried on, if a business man or corporation must be subject to litigation for every letter containing some statement too strong, where it is only sent to the person to whom directed, and only heard by a stenographer to whom the letter is dictated."); *Owen v. Ogilvie Publ'g Co.*, 53 N.Y.S. 1033, 1034 (App. Div. 1898) ("The writing and the copying were but parts of one act; i.e. the production of the letter. Under such conditions we think the dictation, copying, and mailing are to be treated as only one act of the corporation; and . . . there was no publication of the letter[.]"); *Central of Ga. Ry. Co. v. Jones*, 89 S.E. 429, 429 (Ga. Ct. App. 1916) (following *Owen*); *Nichols v. Eaton*, 81 N.W. 792, 793 (Iowa 1900) ("One may make a publication to his servant or agent, without liability, which, if made to a stranger, would be actionable.").

The dissent posits that the *TransUnion* Court cited *Ostrowe v. Lee* in footnote 6 "to illustrate the meaning of publication." Dissenting Op. at 21. In *Ostrowe*, the New York Court of Appeals held that dictating a letter to a stenographer qualified as "publication" for defamation purposes because the contents of the letter had been read by someone other than the defamed person. 175 N.E. 505, 505 (N.Y. 1931). In the dissent's view, "RevSpring is the modern stenographer," Dissenting Op. at 24, and Barclift's allegations are enough to suggest that her information was "read and not merely processed." *TransUnion*, 594 U.S. at 434 n.6.

(*continued on next page*)

18

will result in humiliation, then there is no comparable harm under *TransUnion*.[6]

Finally, Barclift cannot show that she has suffered a concrete injury due to anticipated harm. As a general matter, "[a]llegations of 'possible future injury' are not sufficient to satisfy Article III" in a suit for damages. *Reilly v. Ceridian Corp.*, 664 F.3d 38, 42 (3d Cir. 2011) (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990)); *see TransUnion*, 594 U.S. at 437 ("*Spokeo* did not hold that the mere risk of future harm, without more, suffices to demonstrate Article III standing in a suit for damages."). For a material risk of future harm to be concrete, a plaintiff must show that she was "independently

---

We agree that Barclift's allegations plausibly support an inference that Keystone caused someone at RevSpring to read (and not merely process) information about Barclift's alleged debt. But, in light of the authority mentioned above, we are not convinced that this inference or the Supreme Court's citation to *Ostrowe* means that Barclift's harm bears a close relationship to one that was actionable at common law.

[6] Our view also aligns with Congress's intent in enacting the FDCPA. As Congress explained, the Act's "purpose is to protect consumers from a host of unfair, harassing, and deceptive debt collection practices without imposing unnecessary restrictions on ethical debt collectors." S. Rep. No. 95-382, at 1 (1977). With limited exceptions, the Act prevents debt collectors from "contact[ing] third persons such as a consumer's friends, neighbors, relatives, or employer" because "[s]uch contacts are not *legitimate collection practices* and result in serious invasions of privacy." S. Rep. No. 95-382, at 4 (emphasis added). Using a mailing vendor to contact a consumer in a legitimate attempt to collect a debt is not a practice the statute was meant to prohibit.

19

harmed by [her] exposure to the risk itself." *TransUnion*, 594 U.S. at 437. In *TransUnion*, it was not enough that "[the credit report company] could have divulged [the plaintiffs'] misleading credit information to a third party at any moment." *Id.* at 438. Similarly, the mere assertion that RevSpring's employees *could* access and broadcast Barclift's personal information to the public is far too speculative to support standing. And even though RevSpring suffered a prior data breach in 2014, Barclift has not alleged facts supporting an inference of "a sufficient likelihood that [RevSpring] would . . . intentionally or accidentally release [her] information to third parties." *Id.* Without an actual, materialized injury, "we cannot simply presume a material risk of concrete harm" absent a "serious likelihood of disclosure." *Id.* (quoting *Ramirez v. TransUnion*, 951 F.3d 1008, 1040 (9th Cir. 2020) (McKeown, J., concurring in part and dissenting in part)).[7]

In sum, the type of injury Barclift alleged "is not remotely analogous to the harm caused by the tortious public dissemination of sensitive facts about another's private life." *Nabozny*, 84 F.4th at 737–38 (emphasis omitted). Information transmission that neither travels beyond a private intermediary nor creates a sufficient likelihood of external dissemination cannot compare to a traditionally recognized harm that depends on the humiliating effects of public disclosure. Therefore, we

---

[7] Of course, if RevSpring were to mistakenly release someone's personal information in the future, that person could have a cause of action. *Cf. Clemens v. ExecuPharm Inc.*, 48 F.4th 146, 155 (3d Cir. 2022) (holding, in the data breach context, that an alleged harm was sufficiently concrete because, among other things, there was actual "exposure of personally identifying information" on the dark web).

conclude that Barclift lacks a concrete injury and cannot establish Article III standing.

## C

Although the District Court correctly held that Barclift lacked a concrete injury, it erred in dismissing her complaint with prejudice. "Because the absence of standing leaves the court without subject matter jurisdiction to reach a decision on the merits, dismissals 'with prejudice' for lack of standing are generally improper." *Cottrell v. Alcon Lab'ys*, 874 F.3d 154, 164 n.7 (3d Cir. 2017). That general rule applies here, so we will modify the District Court's order to dismiss the complaint without prejudice and affirm that order as modified.

\*     \*     \*

For the foregoing reasons, we will modify the District Court's order to dismiss the complaint without prejudice and affirm the order as modified.

MATEY, *Circuit Judge*, concurring in part, dissenting in part, and dissenting in the judgment.

"Standing" is a term found in every first-year law school outline, but absent from the text of the Constitution, Founding-era discussions, English and Roman history, and the reported decisions of our federal courts throughout most of the twentieth century. Ever shifting, the judicially created standard of modern standing confuses courts, commentators, and plaintiffs like Paulette Barclift who are told their claim is insufficiently "concrete" to decide. Barclift says Keystone Credit Services shared private information about her physical and financial health with "an untold number of individuals" at a mailing facility close to her home. App. 62. Can she file a lawsuit for her alleged harms? Congress said yes, inserting a private right of action in the Fair Debt Collection Practices Act (FDCPA). And the Supreme Court has explained that the "disclosure of private information" has been "traditionally recognized as providing a basis for lawsuits in American courts." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 425 (2021). I conclude that Barclift's "intangible harms" are sufficiently "concrete" for standing because they bear "a close relationship to harms traditionally recognized as providing a basis for lawsuits in American courts." *Id.*

But Barclift loses because the majority treats *TransUnion*'s footnote six as talismanic, turning dictum into precedent and, along the way, adopting the jot-for-jot reading of caselaw that the majority's opinion purports to reject. Respectfully, I cannot pour that much meaning into a note, particularly where the result only adds to the incoherence of modern standing. So I dissent in part and in the judgment because, while standing "needs a rewrite," as the requirement stands, Paulette Barclift is due her day in court. *Id.* at 461 (Kagan, J., dissenting).[1]

---

[1] *See also, e.g.*, *TransUnion*, 594 U.S. at 442 (Thomas, J., dissenting); *Sierra v. City of Hallandale Beach*, 996 F.3d 1110, 1115 (11th Cir. 2021) (Newsom, J., concurring); *Muransky v. Godiva Chocolatier, Inc.*, 979 F.3d 917, 971 (11th Cir. 2020) (en banc) (Jordan, J., dissenting); *Springer v.*

## I.

The majority surveys circuit caselaw, catalogues the divergent approaches, and selects a test that compares the harm a plaintiff asserts to a harm that traditionally provided a basis to sue in American courts to determine whether an intangible injury is concrete. I agree that conclusion is the best reading of *TransUnion*, even if a natural reading of the FDCPA and Article III make that difficult detour unnecessary.[2] I write separately to explain how the wandering began.

**A.** Article III provides that "[t]he judicial Power shall extend to *all* Cases, in Law and Equity, arising under . . . the Laws of the United States, . . . ." U.S. Const. art. III, § 2 (emphasis added). Text that places no limits on either the judicial power to hear cases or on the legislative power to create causes of action under the laws of the United States. It seems to allow all suits arising under federal law.

Barclift's suit arises under the FDCPA, which prohibits a "debt collector" from "communicat[ing], in connection with the collection of any debt, with any person other than the consumer, his attorney, a consumer reporting agency if otherwise permitted by law, the creditor, the attorney of the creditor, or the attorney of the debt collector." 15 U.S.C. § 1692c(b). The FDCPA includes a private right of action against debt collectors. *See id.* § 1692k(d) ("An action to enforce any liability created by [the FDCPA] may be brought

---

*Cleveland Clinic Emp. Health Plan Total Care*, 900 F.3d 284, 290 (6th Cir. 2018) (Thapar, J., concurring); Erwin Chemerinsky, *What's Standing After* TransUnion LLC v. Ramirez, 96 N.Y.U. L. Rev. Online 269, 286–91 (2021); Daniel J. Solove & Danielle Keats Citron, *Standing and Privacy Harms: A Critique of* TransUnion v. Ramirez, 101 B.U. L. Rev. Online 62, 66–68 (2021); *cf.* Ernest A. Young, *Standing, Equity, and Injury in Fact*, 97 Notre Dame L. Rev. 1885 (2022).

[2] *See Fogle v. Sokol*, 957 F.3d 148, 165 (3d Cir. 2020) (Even where a doctrine "exceeds both [its] historic scope and the statutory text, we cannot use the original meaning of a statute as a 'makeweight' against precedent, nor hand-pick binding decisions to follow." (citation omitted)).

in any appropriate United States district court . . . ."). If the text of Article III is the gate, Barclift's complaint says enough to walk through the doors of the federal courts. History confirms this unfussy understanding that Barclift's suit under the FDCPA constitutes a "case" under Article III.[3] Given the many thoughtful discussions on this subject, *see supra* note 1, a summary of standing will suffice.

**1.** Pre-Founding and early American jurists never used the term "standing" or required an injury in fact or special damage when a private party sued to enforce a private right.[4]

---

[3] As originally understood, a "controversy" was thought to include fewer matters within its realm than did a "case." *See Chisholm v. Georgia*, 2 U.S. (2 Dall.) 419, 431–32 (1793) (Iredell, J.) ("The [Judiciary Act of 1789] more particularly mentions *civil* controversies, a qualification of the general word in the Constitution, which I do not doubt every reasonable man will think well warranted, for it cannot be presumed that the general word 'controversies' was intended to include any proceedings that relate to criminal cases, which in all instances that respect the same Government, only, are uniformly considered of a local nature, and to be decided by its particular laws. The word 'controversy' indeed, would not naturally justify any such construction, but nevertheless it was perhaps a proper instance of caution in *Congress* to guard against the possibility of it."); *see also In re Pac. Ry. Comm'n*, 32 F. 241, 255 (C.C.N.D. Cal. 1887) (Field, J.) ("The judicial article of the constitution mentions cases and controversies. The term 'controversies,' if distinguishable at all from 'cases,' is so in that it is less comprehensive than the latter, and includes only suits of a civil nature." (quoting *Chisholm*, 2 U.S. (2 Dall.) at 431–32)).

[4] To the contrary, "[t]he word *standing* is rather recent in the basic judicial vocabulary and does not appear to have been commonly used until the middle of [the twentieth] century." Joseph Vining, Legal Identity: The Coming of Age of Public Law 55 (1978). Earlier judicial systems, well known to lawyers of the Founding era, used the phrase *stare in iudicium* ("to stand in court") to describe a person's "membership or position in a community" able to sue and be sued "separate from and largely independent of issues related

3

"Historically, common-law courts possessed broad power to adjudicate suits involving the alleged violation of private rights, even when plaintiffs alleged only the violation of those rights and nothing more." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 344 (2016) (Thomas, J., concurring); *see also Muransky v. Godiva Chocolatier, Inc.*, 979 F.3d 917, 971 (11th Cir. 2020) (en banc) (Jordan, J., dissenting) ("English courts at common law heard suits involving private rights, regardless of whether the plaintiff suffered actual damage, . . . ."). Instead, "the English practice was to allow strangers to have standing in the many cases involving the ancient prerogative writs. . . . There were other English precedents for the citizen suit. In the seventeenth and eighteenth centuries, mandamus was available in England, even at the behest of strangers." Cass R. Sunstein, *What's Standing After* Lujan*? Of Citizen Suits, "Injuries," and Article III*, 91 Mich. L. Rev. 163, 171–72 (1992). Factual injury on top of legal injury was not a component of a completely pled complaint. *See, e.g.*, 3 William Blackstone, Commentaries *120 (explaining suits for assault could be brought even when "no actual suffering is proved" and for battery whether "accompanied with pain . . . [or] attended with none").

The Framers wrote Article III against this backdrop. Federal question jurisdiction appeared at the Constitutional Convention in the Virginia Plan, broadly authorizing federal courts to hear "questions which may involve the national peace and harmony." James Madison, Resolutions Proposed by Mr. Randolph in Convention (May 29, 1787), *in* 1 The Records of the Federal Convention of 1787, at 22 (Max Farrand ed., 1911). The Committee of Detail removed the reference to "national peace and harmony" but preserved jurisdiction over "cases arising under laws passed by the Legislature of the United States." James Madison, Mr. Randolph's Delivery of the Report of the Committee of Detail (Aug. 6, 1787), *in* 2 The Records of the Federal Convention of 1787, *supra*, at 186. Few additional changes followed. And when the Committee of

---

to the merits of the lawsuit." Neil H. Cogan, *"Standing" Before the Constitution: Membership in the Community*, 7 L. & Hist. Rev. 1, 1–2 (1989) (tracing the meaning of standing through Roman to European sources familiar to American lawyers of the late 1700s).

Style reported to the Convention in September 1787, the proposed federal judicial power extended "to all cases, both in law and equity, arising under this constitution, the laws of the United States, and treaties made, or which shall be made, under their authority." Report of Committee of Style, *in* 2 The Records of the Federal Convention of 1787, *supra*, at 600.

That troubled George Mason, who voiced concern that there would be no "limitation whatsoever, with respect to the nature or jurisdiction of [the federal] Courts." George Mason, Speech to the Virginia Convention (June 19, 1788), *in* 10 The Documentary History of the Ratification of the Constitution: Ratification of the Constitution by the States: Virginia, No. 3, at 1401 (John P. Kaminski & Gaspare J. Saladino eds., 1993). Responding, James Madison agreed that "it is so necessary and expedient that the Judicial power [of the national government] should correspond with the Legislative" and saw no problems posed by a broad judicial power. James Madison, Speech to the Virginia Convention (June 20, 1788), *in* The Documentary History of the Ratification of the Constitution: Ratification of the Constitution by the States: Virginia, No. 3, *supra*, at 1413. Neither Madison's nor Mason's writings, nor other Founding-era records, mention standing, the now-canonical injury-in-fact requirement, or anything else that would restrict Congress's power to create judicially enforceable rights.

Giants of the early American judiciary agreed, understanding Article III to confer broad power.[5] "It was also

---

[5] *See, e.g.*, 3 Joseph Story, Commentaries on the Constitution of the United States § 1640, at 507 (1833) ("A case, then, in the sense of this clause of the constitution, arises, when some subject, touching the constitution, laws, or treaties of the United States, is submitted to the courts by a party, who asserts his rights in the form prescribed by law. In other words, a case is a suit in law or equity, instituted according to the regular course of judicial proceedings; and, when it involves any question arising under the constitution, laws, or treaties of the United States, it is within the judicial power confided to the Union." (footnote omitted)); *Osborn v. Bank of U.S.*, 22 U.S. (9 Wheat.) 738, 819 (1824) (Marshall, J.) ("[Article III, Section 2] enables the judicial department to receive

understood that Congress could create private rights by statute and that a plaintiff could sue based on a violation of that statutory right without regard to actual damages." *Muransky*, 979 F.3d at 971 (Jordan, J., dissenting) (citing Thomas M. Cooley, A Treatise on the Law of Torts or the Wrongs Which Arise Independent of Contract 271 (2d ed. 1888)); *see also Webb v. Portland Mfg. Co.*, 29 F. Cas. 506, 509 (C.C.D. Me. 1838) (Story, J.) ("[E]very violation imports damage; and if no other be proved, the plaintiff is entitled to a verdict for nominal damages."). Take the 1790 Copyright Act, which allowed patent holders to sue for damages those infringing on the patent, even in the absence of monetary loss. *See* Act of May 31, 1790, ch. 15, § 2, 1 Stat. 124, 124–25.

---

jurisdiction to the full extent of the constitution, laws, and treaties of the United States, when any question respecting them shall assume such a form that the judicial power is capable of acting on it. That power is capable of acting only when the subject is submitted to it by a party who asserts his rights in the form prescribed by law. It then becomes a case, and the constitution declares, that the judicial power shall extend to all cases arising under the constitution, laws, and treaties of the United States.").

The text of Article III supports this view. "Cases" extends "to all the cases described, without making in its terms any exception whatever, and without any regard to the condition of the party. If there be any exception, it is to be implied against the express words of the article." *Cohens v. Virginia*, 19 U.S. (6 Wheat.) 264, 378 (1821) (Marshall, J.). "Controvers[y]," by contrast, "depends entirely on the character of the parties," and if the parties asserting the controversy match those listed in Article III—"to which the United States shall be a Party," "between two or more States," "between a State and Citizens of another State," "between Citizens of different States," "between Citizens of the same State claiming Lands under Grants of different States," and "between a State, or the Citizens thereof, and foreign States, Citizens or Subjects," U.S. Const. art. III, § 2—"it is entirely unimportant what may be the subject of the controversy. Be it what it may, these parties have a constitutional right to come into the Courts of the Union." *Cohens*, 19 U.S. (6 Wheat.) at 378.

The factual injury requirement appeared only when a private individual sued to enforce a public right.[6] "Repeated attempts of private litigants to obtain a special stake in public rights have been consistently denied." *Scripps-Howard Radio v. F.C.C.*, 316 U.S. 4, 20 (1942) (Douglas, J., dissenting) (collecting cases). If an individual sued over a public nuisance, for example, the person had to allege the violation caused them "some extraordinary damage, beyond the rest of the [community]." 3 Blackstone, Commentaries *220; *see also* Ann Woolhandler & Caleb Nelson, *Does History Defeat Standing Doctrine?*, 102 Mich. L. Rev. 689, 703 (2004) ("To be sure, when a public nuisance was threatening special injury to a private plaintiff and the plaintiff was able to win an injunction against the nuisance, the same remedy that protected the plaintiff against private harm also benefited the public as a whole. As a conceptual matter, however, this benefit to the public was 'incidental[]'; the private plaintiff was not thought of as representing the public, but rather as protecting his own private interest." (alteration in original) (quoting *Sparhawk v. Union Passenger Ry. Co.*, 54 Pa. 401, 422 (1867))).

That is the original understanding of Article III, and "courts for centuries held that injury in law to a private right was enough to create a case or controversy." *TransUnion*, 594 U.S. at 449 (Thomas, J., dissenting). For most of American history, if Barclift sued as a private individual to enforce a private right created by Congress, her case would be heard

---

[6] *See TransUnion*, 594 U.S. at 447 (Thomas, J., dissenting) ("But where an individual sued based on the violation of a duty owed broadly to the whole community, such as overgrazing of public lands, courts required 'not only *injuria* [legal injury] but also *damnum* [damage].'" (alterations in original) (citation omitted)); *see also* Caleb Nelson, *Adjudication in the Political Branches*, 107 Colum. L. Rev. 559, 562 (2007) ("Throughout our history, standing doctrine has raised no bar to private litigants with individualized legal interests. At least in the absence of public authorization, however, American courts have generally refused to entertain private lawsuits about matters in which the whole body politic was concerned and in which every individual had the same legal stake. From the early Republic on, such matters were controlled instead by the political branches.").

without any obligation to make a threshold showing of factual injury.[7]

**2.** So what happened? The emergence of new federal agencies started to shift the landscape, although the public-private rights distinction continued without interruption. The idea, born from the minds of jurists like Brandeis and Frankfurter,[8] was "to insulate the nascent regulatory state from legal challenge. A strict requirement of *legal* injury fit well with efforts to limit challenges by regulated entities, which would generally be able to show factual costs from government action but often lacked either protected legal interests or established rights to sue." Ernest A. Young, *Standing, Equity, and Injury in Fact*, 97 Notre Dame L. Rev. 1885, 1890–91 (2022).[9] The Court formally introduced the concept of "injury in fact" in *Association of Data Processing*

---

[7] *See* Adrian Vermeule, Common Good Constitutionalism 177 (2022) ("Until roughly the 1970s, the 'injury in fact' test in its current signification was no part of our law.").

[8] *See Coleman v. Miller*, 307 U.S. 433, 460 (1939) (Frankfurter, J., concurring) (advancing the claim that the "[j]udicial power could come into play only in matters that were the traditional concern of the courts at Westminster and only if they arose in ways that to the expert feel of lawyers constituted 'Cases' or 'Controversies'").

[9] Like most scholarly explanations, this "insulation thesis" has its challengers. But there seems to be a consensus that expanded executive administration brought the discussion of standing to center stage. *See* Daniel E. Ho & Erica L. Ross, *Did Liberal Justices Invent the Standing Doctrine? An Empirical Study of the Evolution of Standing, 1921–2006*, 62 Stan. L. Rev. 591, 604–07 (2010). As Judge Fletcher reasoned, "private entities increasingly came to be controlled by statutory and regulatory duties" while "government increasingly came to be controlled by statutory and constitutional commands." William A. Fletcher, *The Structure of Standing*, 98 Yale L.J. 221, 225 (1988). When "individuals sought to control the greatly augmented power of the government through the judicial process, many kinds of plaintiffs and would-be plaintiffs sought the articulation and enforcement of new and existing rights in the federal courts." *Id.*

*Organizations v. Camp*, when it held that, in the context of the Administrative Procedure Act (APA), the plaintiff needed only to allege an "injury in fact, economic or otherwise" to sue under the APA. 397 U.S. 150, 152 (1970).[10] The Court added that "[t]he question of standing is different" from a test that looks to the plaintiff's legal interest, which "goes to the merits." *Id.* at 153. Rather, standing "concerns, apart from the 'case' or 'controversy' test, the question whether the interest sought to be protected by the complainant is arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question. Thus the [APA] grants standing to a person 'aggrieved by agency action within the meaning of a relevant statute.'" *Id.* (quoting 5 U.S.C. § 702). "Instead of a careful examination of the governing law to see if Congress had created a legal interest, the standing inquiry would be a simple one barely related to the underlying law. Henceforth the issue would turn on facts, not on law." Sunstein, *supra*, at 185. "Under the New Deal view, the common law was a regulatory system that should be evaluated pragmatically, in terms of whether it served human liberty and welfare. When it failed to do so, the system had to be supplemented or replaced." *Id.* at 187.

Standing's political valence shifted to an indirect limit on congressional power (ignoring, among other options, a fresh examination on the meaning of Article I, Section 8, Clause 3 of the Constitution). In 1983, then-Judge Scalia published an article explaining his view that "[t]he requirement of standing has been made part of American constitutional law through (for want of a better vehicle) the provision of Art. III, Sec. 2." Antonin Scalia, *The Doctrine of Standing as an Essential Element of the Separation of Powers*, 17 Suffolk U. L. Rev. 881, 882 (1983). He went on: "[t]here is no case or controversy, the reasoning has gone, when there are no adverse parties with personal interest in the matter. Surely not a linguistically inevitable conclusion, but nonetheless an accurate description

---

[10] On the same day, the Court applied its new injury-in-fact requirement to another APA challenge. *See Barlow v. Collins*, 397 U.S. 159, 163–64 (1970); *see also* Sunstein, *supra*, at 185–86 (tracing "injury in fact" to Kenneth Culp Davis's analysis of the APA (citing 3 Kenneth C. Davis, Administrative Law Treatise § 22.02, at 211–13 (1958))).

of the sort of business courts had traditionally entertained, and hence of the distinctive business to which they were presumably to be limited under the Constitution." *Id.* (footnote omitted). He described the notion that Congress may create legal rights as "a peculiar characteristic of standing." *Id.* at 885. But he was bothered by Congress's control over the creation of legal rights given the increasing power of the regulatory state. With little discussion of constitutional text or history, Judge Scalia concluded that "the judicial doctrine of standing is a crucial and inseparable element of [the principle of separation of powers], whose disregard will inevitably produce . . . an overjudicialization of the process of self-governance." *Id.* at 881.

In 1992, Justice Scalia penned the modern-day test for standing in *Lujan v. Defenders of Wildlife*, establishing the atextual tripart test for determining whether a party has standing to bring suit. *See* 504 U.S. 555, 560–61 (1992). The broad, sweeping language of *Lujan* did not apply only in the public rights category, though the result, by happenstance, remained consistent with the historical public-private rights distinction.[11] Ever since, the Court has continued to march down *Lujan*'s path, while neglecting to engage with the public-private rights distinction.

**3.** Bringing us to *TransUnion*. That decision marked the first time the Supreme Court required a private individual to make some threshold showing of concrete harm,

---

[11] The standing issue was teed up for the Court by the parties' briefs and the district and appellate court decisions that preceded it. But even those arguments were colored with uncertainty about the meaning or scope of standing. Prior to the Supreme Court's review, the Eighth Circuit observed that "[t]he doctrines that stem from Article III, such as standing, mootness, ripeness, and political question, relate 'to an idea, which is more than an intuition but less than a rigorous and explicit theory, about the constitutional and prudential limits to the powers of an unelected, unrepresentative judiciary in our kind of government.'" *Defs. of Wildlife v. Hodel*, 851 F.2d 1035, 1038 (8th Cir. 1988) (quoting *Vander Jagt v. O'Neill*, 699 F.2d 1166, 1178–79 (D.C. Cir. 1982) (Bork, J., concurring)).

even though he was seeking to vindicate a private right. *See* 594 U.S. at 453–54 (Thomas, J., dissenting) ("Never before has this Court declared that legal injury is *inherently* insufficient to support standing."); *see also Muransky*, 979 F.3d at 978–79 (Jordan, J., dissenting) (finding no "contemporary Supreme Court case in which a plaintiff had a private statutory right but was denied standing"). And the yardstick chosen to measure concreteness—the close-relationship test—swapped the text and history of Article III for unspecified and undetermined markers in American "history and tradition." *TransUnion*, 594 U.S. at 424 (majority opinion). A plaintiff's allegations need not "exact[ly] duplicate" the elements of a common law cause of action, only resemble the "harm[s] *associated with*" those causes of action. *Id.* at 432–33.

This illustrates a judicial test "displac[ing] . . . controlling, nonjudicial, primary texts." *OI Eur. Grp. B.V. v. Bolivarian Republic of Venez.*, 73 F.4th 157, 175 n.22 (3d Cir. 2023) (citation omitted); *see also* Peter Bozzo, Note, *The Jurisprudence of "As Though": Democratic Dialogue and the Signed Supreme Court Opinion*, 26 Yale J.L. & Human. 269, 289 (2014) (Judicial "tests often take on a life of their own, displacing the [source of law] from which they are drawn."). Leaving us to work with only a "metaphor for the law" instead of the law itself. Mitchel de S.-O.-l'E. Lasser, *"Lit. Theory" Put to the Test: A Comparative Literary Analysis of American Judicial Tests and French Judicial Discourse*, 111 Harv. L. Rev. 689, 768 (1998)).

But work with the shadow we must, for "unless we wish anarchy to prevail within the federal judicial system," precedent must be followed "by the lower federal courts no matter how misguided the judges of those courts may think it to be." *Hutto v. Davis*, 454 U.S. 370, 375 (1982) (per curiam). So I move to the best reading of *TransUnion*.

## II.

*TransUnion*'s close-relationship test starts from the premise that "Article III confines the federal judicial power to the resolution of 'Cases' and 'Controversies.'" *TransUnion*, 594 U.S. at 423. "For there to be a case or controversy under Article III, the plaintiff must have a 'personal stake' in the case—in other words, standing." *Id.* (quoting *Raines v. Byrd*,

11

521 U.S. 811, 819 (1997)). And to establish standing, "a plaintiff must show (i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." *Id.* (citing *Lujan*, 504 U.S. at 560–61). "If 'the plaintiff does not claim to have suffered an injury that the defendant caused and the court can remedy, there is no case or controversy for the federal court to resolve.'" *Id.* (citation omitted)). Barclift's case homes in on the injury-in-fact requirement—that the plaintiff's injury be "real, and not abstract." *Id.* at 424 (quoting *Spokeo*, 578 U.S. at 340). We can reduce that requirement to three questions.

*First*, when assessing whether a harm is sufficiently concrete for standing, "the Court has explained that 'history and tradition offer a meaningful guide to the types of cases that Article III empowers federal courts to consider.'" *Id.* (quoting *Sprint Commc'ns Co., L.P. v. APCC Servs., Inc.*, 554 U.S. 269, 274 (2008)). "And with respect to the concrete-harm requirement in particular," *Spokeo* and *TransUnion* instruct courts to "assess whether the alleged injury to the plaintiff has a 'close relationship' to a harm 'traditionally' recognized as providing a basis for a lawsuit in American courts." *Id.*; *see also Spokeo*, 578 U.S. at 341 ("[I]t is instructive to consider whether an alleged intangible harm has a close relationship to a harm that has traditionally been regarded as providing a basis for a lawsuit in English or American courts." (citing *Vt. Agency of Nat. Res. v. U.S. ex rel. Stevens*, 529 U.S. 765, 775–77 (2000))). Under the close-relationship test, plaintiffs must identify "a close historical or common-law analogue for their asserted injury," but an "exact duplicate in American history and tradition" is not required. *TransUnion*, 594 U.S. at 424.[12]

*Second*, while "traditional tangible harms, such as physical harms and monetary damages," "readily qualify as

---

[12] Which history and tradition to consult is another challenge. *TransUnion* directs a search for "harms traditionally recognized as providing a basis for lawsuits in American courts," 594 U.S. at 425, but cites tort law as restated in the twentieth century as "longstanding American law," *id.* at 432 (citing Restatement (First) of Torts § 559 (1938)). But a

concrete injuries under Article III," certain "intangible harms can also be concrete." *Id.* at 425. "Chief among them are injuries with a close relationship to harms traditionally recognized as providing a basis for lawsuits in American courts." *Id.* Qualifying intangible harms "include, for example, reputational harms, disclosure of private information, and intrusion upon seclusion." *Id.*

*Third*, along with common-law analogues, courts must consider "Congress's decision to impose a statutory prohibition or obligation on a defendant, and to grant a plaintiff a cause of action to sue over the defendant's violation of that statutory prohibition or obligation." *Id.* Indeed, Congress may enact a statute that "elevate[s]" certain "concrete, *de facto* injuries" "to the status of legally cognizable injuries" even

---

twentieth-century translation does not necessarily nor accurately state current law, let alone tell us anything about law as traditionally understood. *Cf. Kansas v. Nebraska*, 574 U.S. 445, 476 (2015) (Scalia, J., concurring in part and dissenting in part) ("[I]t cannot safely be assumed, without further inquiry, that a Restatement provision describes rather than revises current law.").

*TransUnion* also cites *Spokeo*, which cites *Vermont Agency* as an example of looking to traditionally recognized harms. *See TransUnion*, 594 U.S. at 425 (citing *Spokeo*, 578 U.S. at 340–41). *Vermont Agency* looks to "the long tradition of *qui tam* actions in England and the American Colonies," dating back to "around the end of the 13th century." 529 U.S. at 774–75. So if looking to tradition means looking to England and the colonies, individuals alleging violations of private rights would not need to show harm. *See TransUnion*, 594 U.S. at 448 (Thomas, J., dissenting) ("The principle that the violation of an individual right gives rise to an actionable harm was widespread at the founding, in early American history, and in many modern cases."); *Muransky*, 979 F.3d at 971 (Jordan, J., dissenting) ("English courts at common law heard suits involving private rights, regardless of whether the plaintiff suffered actual damage . . . ."). But notice that *TransUnion* narrowed *Spokeo*'s class of permissible analogues from claims heard in "English or American courts," *Spokeo*, 578 U.S. at 341, to claims heard only in "American courts," *TransUnion*, 594 U.S. at 424.

though they "were previously inadequate in law." *Id.* at 426 (quoting *Spokeo*, 578 U.S. at 341). But while "Congress may 'elevate' harms that 'exist' in the real world before Congress recognized them to actionable legal status, it may not simply enact an injury into existence, using its lawmaking power to transform something that is not remotely harmful into something that is." *Id.* (citation omitted).

Putting it all together, we must evaluate whether Barclift's asserted harm bears a close relationship to a harm traditionally recognized as providing a basis for suit in American courts; and, if Barclift has a sufficiently concrete harm, evaluate whether Congress has elevated that harm to a legally cognizable injury. To that task I turn.

**A.    History**

Barclift's "asserted harm has a 'close relationship' to a harm traditionally recognized as providing a basis for a lawsuit in American courts." *Id.* at 433. That inquiry requires "a close historical or common-law analogue for [her] asserted injury," not "an exact duplicate." *Id.* at 424.

**1.**    Start with Barclift's alleged harm: the "disclosure of private information of a personal, sensitive nature" to a third party without her consent. App. 62. It stems from a "Notice of Account Placement" Barclift received stating that her "account with Main Line Fertility Center, Inc. ha[d] been assigned to" Keystone. App. 67. The letter listed Barclift's Keystone account number, the date of her purported delinquency, and the balance due. A bold notice advised "this communication is from a debt collection company. This is an attempt to collect a debt; any information obtained will be used for that purpose." App. 67.

Though the letter arrived on Keystone's letterhead, a third-party vendor, RevSpring, had prepared and mailed it. That must mean Keystone "provided information regarding [Barclift] and the Debt" to RevSpring and its hundreds of employees, including her "name and address, the amount of the Debt, the name of the current creditor, and other private details regarding the Debt." App. 56. Barclift says she "did not consent to [Keystone] communicating with RevSpring in connection with the collection of the Debt," nor did she

14

authorize Keystone to engage in similar communications with other third-party vendors. App. 56. And she claims the unauthorized "disclosure of her personal financial details, as well as the sensitive details of her personal medical services, to an untold number of individuals affiliated with RevSpring" made her feel embarrassed, anxious, and stressed. App. 62. Take those allegations as true, and Barclift argues the unauthorized disclosure tracks two common-law privacy torts: public disclosure of private facts and breach of confidence. She is right.

The tort of public disclosure prohibits "unauthorized *disclosures* of information." *In re Horizon Healthcare Servs. Inc. Data Breach Litig.*, 846 F.3d 625, 638 (3d Cir. 2017), *quoted in* Kamal v. J. Crew Grp., Inc., 918 F.3d 102, 114 (3d Cir. 2019). And "breach of confidence involves 'the unconsented, unprivileged disclosure to a third party of nonpublic information that the defendant has learned within a confidential relationship.'" *Kamal*, 918 F.3d at 114 (quoting Alan B. Vickery, Note, *Breach of Confidence: An Emerging Tort*, 82 Colum. L. Rev. 1426, 1455 (1982)).[13] As this Court

---

[13] Keystone did not address Barclift's arguments about breach of confidence. And the majority "hesitate[s] to conclude" that the harm associated with breach of confidence bears a close relationship to a harm traditionally recognized as providing a basis for suit in American courts because "it 'died out in its infancy,' likely due to the 'birth and explosive growth' of traditional privacy torts such as the public disclosure of private facts." Majority Op. at 14 n.3 (quoting Vickery, *supra*, at 1454–55). But that only acknowledges breach of confidence existed in earlier American and English jurisprudence, even if it fell out of vogue for a time. And its reemergence in the 1980s demonstrates its continued distinction from other torts.

Barclift is correct that breach of confidence is a proper common-law analogue for her alleged harm. Considered by English courts as early as 1849 and American courts as early as 1894, breach of confidence has deep roots, at least as deep as those of public disclosure of private facts, a tort the majority and the Supreme Court accept as a traditionally recognized basis for suit in American courts. *See Prince Albert v. Strange*

held five years ago, "the harm underlying both of these actions transpires when a third party gains unauthorized access to a plaintiff's personal information." *Id.* Meaning the "unlawful disclosure of legally protected information" is itself a "*de facto* injury." *In re Nickelodeon Consumer Priv. Litig.*, 827 F.3d 262, 274 (3d Cir. 2016); *see also St. Pierre v. Retrieval-Masters Creditors Bureau, Inc.*, 898 F.3d 351, 357–58 (3d Cir. 2018) (same); *DiNaples v. MRS BPO, LLC*, 934 F.3d 275, 279–80 (3d Cir. 2019) (same).

The Supreme Court reached the same conclusion in *TransUnion*. It specifically listed the "disclosure of private

---

(1849) 41 Eng. Rep. 1171, 1178; 1 Mac. & G. 25, 44; *Corliss v. E.W. Walker Co.*, 64 F. 280, 281 (C.C.D. Mass. 1894); *see also* Samuel D. Warren & Louis D. Brandeis, *The Right to Privacy*, 4 Harv. L. Rev. 193, 207 (1890) ("It should be stated that, in some instances where protection has been afforded against wrongful publication, the jurisdiction has been asserted, not on the ground of property, or at least not wholly on that ground, but upon the ground of an alleged breach of an implied contract or of a trust or *confidence*." (emphasis added)); *Pavesich v. New Eng. Life Ins. Co.*, 50 S.E. 68, 75 (Ga. 1905) ("It must be conceded that the numerous cases decided before 1890 in which equity has interfered to restrain the publication of letters, writings, papers, etc., have all been based either upon the recognition of a right of property, or upon the fact that the publication would be a breach of contract, *confidence*, or trust. It is well settled that, if any contract or property right or trust relation has been violated, damages are recoverable. There are many cases which sustain such a doctrine." (emphasis added)). Its failure to gain popularity over alternative privacy torts in the early twentieth century is not fatal to this conclusion. The mere fact that, for a time, plaintiffs chose to utilize alternative causes of action does not render the underutilized cause of action unable to sustain a suit at common law.

Barclift's alleged harm bears a close relationship to the harm arising from breach of confidence. The confidential relationship is legally significant to the tort only because it imposes a duty on the defendant to maintain the plaintiff's private information. *See* Vickery, *supra*, at 1456–57. Here that duty is imposed by the FDCPA. *See* 15 U.S.C. § 1692c(b).

16

information" as an example of a "harm[] traditionally recognized as providing a basis for lawsuits in American courts." 594 U.S. at 425.[14] Because Barclift claims Keystone concretely harmed her by unlawfully disclosing her private information, she has done enough.

**2.** The majority sets a higher bar, requiring more fit between Barclift's asserted harm and the common-law analogues. In the majority's view, Barclift loses because her

---

[14] A proposition the Court supported by citing *Davis v. Federal Election Commission*, which held that a candidate had standing to challenge a campaign finance law requiring him to disclose personal contributions beyond a certain amount. *See* 554 U.S. 724, 733 (2008). At common law, the tort of public disclosure requires "the matter publicized" to be "of a kind that (a) would be highly offensive to a reasonable person, and (b) is not of legitimate concern to the public." Restatement (Second) of Torts § 652D (1977). But neither of these elements mattered to the Court in *Davis*, nor did the Court mention them in *TransUnion*. *See Clemens v. ExecuPharm Inc.*, 48 F.4th 146, 155 n.5 (3d Cir. 2022) ("[W]hether a plaintiff has successfully made out claims under a particular cause of action is a separate question."). The "disclosure of private information" alone constituted the classic example of a concrete intangible harm. *TransUnion*, 594 U.S. at 425.

A conclusion with support dating back to at least 1905. *See Pavesich*, 50 S.E. at 80–81 ("So thoroughly satisfied are we that the law recognizes, within proper limits, as a legal right, the right of privacy, and that the publication of one's picture without his consent by another as an advertisement, for the mere purpose of increasing the profits and gains of the advertiser, is an invasion of this right, that we venture to predict that the day will come that the American bar will marvel that a contrary view was ever entertained by judges of eminence and ability."); *see also Cox Broad. Corp. v. Cohn*, 420 U.S. 469, 488–89 (1975) (acknowledging that "the century has experienced a strong tide running in favor of the so-called right of privacy," explaining that "a 'right of privacy' has been recognized at common law" in much of the country, and discussing "[t]he version of the privacy tort . . . termed . . . 'the tort of public disclosure'" (quoting *Time, Inc. v. Hill*, 385 U.S. 374, 383 n.7 (1967))).

17

Amended Complaint lacks allegations of publicity, removing the kind of harm traditionally associated with public disclosure. But Barclift alleges that she suffered embarrassment, anxiety, and stress over the disclosure of her information to RevSpring—harms that are "of the same character" as privacy harms traditionally associated with public disclosure. *Susinno v. Work Out World Inc.*, 862 F.3d 346, 352 (3d Cir. 2017) (concluding that, although plaintiff's allegations "traditionally would provide no cause of action," Congress "sought to protect the same interests implicated in the traditional common law cause of action" when it enacted the statute at issue and thus plaintiff had standing under the statute). Nothing in *TransUnion* endorses, let alone requires, the majority's contrary result.

      **a.** *TransUnion*'s close-relationship test directs courts to focus on harms (not causes of action) and look for comparisons in kind (not degree). *See Hunstein v. Preferred Collection & Mgmt. Servs., Inc.*, 48 F.4th 1236, 1264 (11th Cir. 2022) (en banc) (Newsom, J., dissenting) (discussing the "'kind-degree' framework"). And when comparing harms, *TransUnion* expressly disavows an "exact duplicate" requirement.[15]

_____

      [15] *See* 594 U.S. at 433 ("[W]e do not require an exact duplicate."); *id.* at 424 ("*Spokeo* does not require an exact duplicate in American history and tradition."); *see also id.* ("[C]ourts should assess whether the alleged injury to the plaintiff has a 'close relationship' to a harm 'traditionally' recognized as providing a basis for a lawsuit in American courts."); *id.* at 425 (requiring "injuries with a close relationship to harms traditionally recognized as providing a basis for lawsuits in American courts"); *id.* at 432 (assessing plaintiffs' contention that their "injury bears a 'close relationship' to a harm traditionally recognized as providing a basis for a lawsuit in American courts"); *id.* (finding certain class members "suffered a harm with a 'close relationship' to the harm associated with the tort of defamation"); *id.* at 433 (stating courts should "look[] to whether a plaintiff's asserted harm has a 'close relationship' to a harm traditionally recognized as providing a basis for a lawsuit in American courts").

*TransUnion*'s reasoning follows this distinction to hold that the mere transmission of misleading information—with no further harms or consequences—constitutes a concrete injury. *See* 594 U.S. at 433. TransUnion flagged thousands of individuals with a "potential match" to names on the U.S. Department of the Treasury Office of Foreign Assets Control (OFAC) list of "'specially designated nationals' who threaten America's national security." *Id.* at 419–20. The OFAC list names "terrorists, drug traffickers, [and] other serious criminals." *Id.* at 419. TransUnion's misleading labels imposed different kinds of harm. For Sergio Ramirez (the class representative), the label had real world consequences: he tried to buy a car, but the dealership refused to do business with him "because his name was on a 'terrorist list.'" *Id.* at 420. For 1,853 class members (including Ramirez), "TransUnion provided third parties with credit reports containing" the misleading terrorist label. *Id.* at 432. We do not know if other class members suffered harms beyond their credit reports; all the opinion tells us is that these class members had misleading information sent to third parties. *See id.* And for the Court, the mere transmission of that misleading information (with nothing further) constituted "a harm with a 'close relationship' to the harm associated with the tort of defamation." *Id.*

The Court could have required a more stringent connection to defamation. For one thing, the label was true: the class members' names were "potential" matches with those of terrorists. *See id.* at 420. TransUnion argued that this undercut the defamation analogy. *See id.* at 433. But the Court rejected TransUnion's push for "an exact duplicate," finding instead that "the harm from a misleading statement . . . bears a sufficiently close relationship to the harm from a false and defamatory statement." *Id.*

The Court could have required more specificity. The hornbook definition of defamation requires some sort of "special harm." *See* Restatement (Second) of Torts § 558 (1977) (requiring either "the existence of special harm" or a statement actionable "irrespective of special harm" (i.e., defamation *per se*)). If the plaintiff lacks "special harm," he may only recover by showing that the statement constituted "defamation *per se*." *Franklin Prescriptions, Inc. v. N.Y. Times Co.*, 424 F.3d 336, 43 (3d Cir. 2005) (citation omitted). And

defamation *per se* historically applies to "words imputing (1) criminal offense, (2) loathsome disease, (3) business misconduct, or (4) serious sexual misconduct." *Synygy, Inc. v. Scott-Levin, Inc.*, 51 F. Supp. 2d 570, 580 (E.D. Pa. 1999), *aff'd sub nom. Synygy, Inc. v. Scott-Levin*, 229 F.3d 1139 (3d Cir. 2000) (citation omitted). The misleading terrorist label seems analogous to "words imputing . . . criminal offense," *id.*, but the Court did not wade into, let alone rest on, that level of granularity. It instead drew an analogy to the general "reputational harm *associated with* the tort of defamation," and found that the mere transmission of a misleading (though literally true) statement implicated this kind of harm. *TransUnion*, 594 U.S. at 432 (emphasis added).

Summed up, *TransUnion*'s text and reasoning support performing a general, kind-of-harm comparison that rejects exact duplication. I concur in the majority's adoption of this approach. But its application veers into an unnecessary jot-for-jot exactness to some common-law cause of action.[16]

**b.** Footnote six in *TransUnion* does not require a different outcome. I start by unpacking what the Court wrote.

---

[16] In an attempt to fit its analysis under the kind-of-harm approach, the majority distinguishes between the harms arising from public dissemination and private dissemination. But as the Supreme Court recognized, the degree of dissemination only affects the "*extent* of the protection accorded a privacy right." *Dep't of Just. v. Reps. Comm. for Freedom of Press*, 489 U.S. 749, 763 (1989) (emphasis added). Meaning Barclift might be unable to recover on a claim for public disclosure at common law. But she has still suffered *some* intrusion on her right to privacy through the unauthorized disclosure. While that harm may be a mere "trifle of injury," that is all we require for her to stand in court. *Danvers Motor Co., Inc. v. Ford Motor Co.*, 432 F.3d 286, 294 (3d Cir. 2005) (citation omitted). Recall that Barclift need not establish the elements of a common-law analogue to have standing to assert her FDCPA claim. *See TransUnion*, 594 U.S. at 433 ("[W]e do not require an exact duplicate."). She only needs to assert a harm with a "'close relationship' to a harm traditionally recognized as providing a basis for a lawsuit in American courts." *Id.* She has done so.

Recall that TransUnion sent the OFAC list to third-party vendors who printed and mailed the information to the class members. The class argued that "TransUnion 'published' the class members' information internally—for example, to employees within TransUnion and to the vendors that printed and sent the mailings that the class members received." *Id.* at 434 n.6. The Court reasoned that communication requires "evidence that the defendant actually 'brought an idea to the perception of another,' and thus generally require[s] evidence that the document was actually read and not merely processed." *Id.* (quoting Restatement (First) of Torts § 559, cmt. a (1938)) (citing *Ostrowe v. Lee*, 256 N.Y. 36, 38–39 (1931) (Cardozo, J.)). The Court then concluded that "the plaintiffs' internal publication theory circumvents a fundamental requirement of an ordinary defamation claim— publication—and does not bear a sufficiently 'close relationship' to the traditional defamation tort to qualify for Article III standing." *Id.*

Barclift still has standing despite *TransUnion*'s footnote six. To begin, the Court explained these class members failed to produce evidence at trial "that the [misleading credit reports were] actually read and not merely processed." *Id.* That makes sense: it is possible in our automated world that nobody even saw the data flowing from TransUnion's servers to the computers in the vendors' back offices. But the inverse does not follow—that, even if the challenged disclosures *were* read by a processor, they could not be actionable. I cannot read the lack of evidence to also mean that no evidence could suffice because *all* disclosures to intermediaries are beyond the ordinary meaning of publication. Not only would that defy logic, it would undermine *Ostrowe v. Lee*, the case cited by the Court to illustrate the meaning of publication. The plaintiff there sued a defendant for libel, alleging "that the defendant composed a letter accusing the plaintiff of the crime of larceny; that he dictated this letter to his stenographer; that the stenographer, in obedience to his orders, read the notes and transcribed them; and that the letter so transcribed was received by the plaintiff through the mails." 256 N.Y. at 38.

The defendant responded that no publication occurred because "[a] defamatory writing is not published if it is read by no one but the defamed." *Id.* But the New York Court of

Appeals, per Chief Judge Cardozo, held that the "complaint [was] good upon its face" because someone else had read the defamatory writing: the stenographer. *Id.* at 38, 41. Indeed, publication occurs "as soon as read by any one else." *Id.* at 38. Cardozo takes care to show his homework, and the result is worth reprinting in full:

> The reader may be a telegraph operator (*Williamson v. Frere*, [(1874)] L. R. 9 C. P. 393), or the compositor in a printing house (*Baldwin v. Elphinston*, [(1775)] 2 W. Bl. 1037), or the copyist who reproduces a long hand draft (*Puterbaugh v. Gold Medal F. M. Co.*, [(1904)] 7 Ont. L. R. 582, 586). The legal consequence is not altered where the symbols reproduced or interpreted are the notes of a stenographer. Publication there still is as a result of the dictation, at least where the notes have been examined or transcribed (*Pullman v. Hill & Co.*, [1891] 1 Q. B. 524; *Boxsius v. Goblet Freres*, [1894] 1 Q. B. 842; *Gambrill v. Schooley*, 93 Md. 48 [(1901)]; *Ferdon v. Dickens*, 161 Ala. 181 [(1909)]; *Berry v. City of New York Ins. Co.*, 210 Ala. 369, 371 [(1923)]; *Nelson v. Whitten*, 272 F.[] 135 [(E.D.N.Y. 1921)]; *Puterbaugh v. Gold Medal F. M. Co.*, *supra*; Gatley, Libel & Slander, p. 91; *cf. Kennedy v. Butler, Inc.*, 245 N. Y. 204 [(1927)]). Enough that a writing defamatory in content has been read and understood at the behest of the defamer (1 Street, Foundations of Legal Liability, p. 297).

*Id.* (fourth and fifth alterations in original). It is a strong line of cases traversing the continent, crossing the pond, and dating back dozens of decades directly undercutting the notion that no harm ever follows communication to intermediaries.[17] Under

---

[17] The majority "agree[s] that Barclift's allegations plausibly support an inference that Keystone caused someone at RevSpring to read (and not merely process) information about Barflict's alleged debt," but is "not convinced that this inference or the Supreme Court's citation to *Ostrowe* means

that Barclift's harm bears a close relationship to one that was actionable at common law." Majority Op. at 19 n.5. A conclusion the majority supports with cites to cases showing that "communications to an associate in the ordinary course of business did not support an action at common law." Majority Op. at 17 n.5. But those cases deal with *privileged* communications. *See, e.g.*, *Chalkley v. Atl. Coast Line R. Co.*, 150 Va. 301, 334 (1928) ("Here, however, the communication was privileged and the typist had a duty to discharge in the ordinary course of business in connection with the transcription of the communication."); *Globe Furniture Co. v. Wright*, 265 F. 873, 876 (D.C. Cir. 1920) ("But we prefer to put our decision upon the ground that the occasion was conditionally privileged, that the letter was within the privilege, that there was no malice, and therefore that the letter is not actionable."); *Rodgers v. Wise*, 7 S.E.2d 517, 517–19 (S.C. 1940) (finding satisfactory the conclusions of the lower court, which held that the letter was "privileged and that the writing and mailing of it [was] not a publication"); *Cartwright-Caps Co. v. Fischel & Kaufman*, 74 So. 278, 279 (Miss. 1917) (concluding that "the letters were privileged, and that there was not, in a legal sense, a publication of the letters in question"); *Owen v. Ogilvie Publ'g Co.*, 32 A.D. 465, 466–67 (N.Y. App. Div. 1898) (explaining that "[i]t may be that the dictation to the stenographer and her reading of the letter would constitute a publication of the same by the person dictating it, if the relation existing between the manager and the copyist was that of master and servant, and the letter be held not to be privileged. Such, however, was not the relation of these persons. They were both employed by a common master, and were engaged in the performance of duties which their respective employments required. Under such circumstances we do not think that the stenographer is to be regarded as a third person in the sense that either the dictation or the subsequent reading can be regarded as a publication by the corporation"); *Cent. of Ga. Ry. Co. v. Jones*, 89 S.E. 429, 429 (Ga. Ct. App. 1916) (reversing judgment and following rule in *Owen*); *Nichols v. Eaton*, 81 N.W. 792, 793 (Iowa 1900) ("One may make a publication to his servant or agent, without liability, which, if made to a stranger, would be actionable," if "[t]he occasion was undoubtedly privileged").

23

Barclift's Amended Complaint, RevSpring is the modern stenographer. Whether RevSpring "read and understood" the information Keystone sent is a question for discovery and another day. For today, it is enough that Barclift alleges Keystone "communicated with RevSpring"—as well as "an untold number of individuals affiliated with RevSpring"—and "provided [them] information regarding [Barclift] and the Debt . . . —including [her] name and address, the amount of the Debt, the name of the current creditor, and other private details regarding the Debt." App. 56, 62. Accepting those factual

---

The presence of a privilege separates the claims in *Ostrowe*, the cases it cites, and the decisions that reach the same conclusions as Cardozo. *See also, e.g.*, *Rickbeil v. Grafton Deaconess Hosp.*, 74 N.D. 525, 542 (1946); *State v. McIntire*, 20 S.E. 721, 722 (N.C. 1894). Conclusions that constitute no outlier or minority approach. *See, e.g.*, Martin L. Newell, The Law of Slander and Libel in Civil and Criminal Cases § 195, 242–43 (4th ed. 1924) (describing the rule later adopted by *Ostrowe* as the "leading" American approach); Restatement (First) of Torts § 577, cmt. h (1938) (adopting *Ostrowe*'s publication holding). Rather, *Ostrowe*'s rule that disclosing private information to intermediaries constitutes publication is the starting point, subject to attacks to the *prima facie* case such as privilege. *See Rickbeil*, 74 N.D. at 542 ("A defamatory writing, which on its face is libelous per se, is presumed to be unprivileged and therefore when the plaintiff proved the publication of this libel he made out a cause of action showing an unprivileged publication."); *Kennedy*, 245 N.Y. at 207 ("Whether such a publication were privileged—a privileged communication—is another matter. Privilege presupposes publicity. The plea of privilege is unnecessary if there has been no publication."). *Ostrowe* and the majority's cases both show that the disclosure of private information to an intermediary was actionable at common law. Whether a plaintiff may successfully recover is a different—and premature—question in our standing inquiry.

In any event, that courts allowed both approaches—in different jurisdictions at different times—does not mean that disclosures to intermediaries were not actionable at common law. *TransUnion* did not insist on harms traditionally recognized in *every* American court. Nor harms that would withstand every defense against them.

24

allegations as true and extending all reasonable inferences in her favor, Barclift has done enough to show that she has standing. *See St. Pierre*, 898 F.3d at 354 n.1.

## B.    Judgment of Congress

The judgment of Congress confirms the concreteness of Barclift's asserted injury. *See TransUnion*, 594 U.S. at 425–26. Courts consult "Congress's views" to determine whether Congress has "elevate[d] to the status of legally cognizable" a concrete injury that was "previously inadequate in law." *Id.* at 425 (quoting *Spokeo*, 578 U.S. at 341). Of course, "courts must presume that a legislature says in a statute what it means and means in a statute what it says there." *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253–54 (1992).

Congress has expressed its judgment in two provisions. First, Congress made it unlawful for a debt collector to communicate about "the collection of any debt" with "any person," unless the collector first obtains "the prior consent of the consumer." 15 U.S.C. § 1692c(b). And second, in a provision titled "Congressional findings and declarations of purpose," Congress listed the "invasion[] of individual privacy" as one of the harms to which the FDCPA was directed. *Id.* § 1692(a). Understood against the backdrop of common law privacy protections, the "legislative aim," *OI Eur. Grp. B.V.*, 73 F.4th at 170 (citing 1 Blackstone, Commentaries *87), of these provisions is clear: to elevate a real-world harm (the unauthorized disclosure of private information) to "actionable legal status," *TransUnion*, 594 U.S. at 426 (citation omitted).

Maybe "Congress could have created . . . a [more] cumbersome scheme" to protect debtor privacy. *Krakauer v. Dish Network, L.L.C.*, 925 F.3d 643, 654 (4th Cir. 2019). One that requires the debtor to prove that her private information became public in the common-law sense of the word. Or maybe one that excepts third-party vendors from the general bar on communications (like the exceptions for attorney communications). Instead, Congress "opted for a more straightforward and manageable way of protecting personal privacy, and the Constitution in no way bars it from doing so." *Id.* That congressional judgment deserves the respect of the courts.

\* \* \*

*TransUnion* warned that "the concrete-harm requirement can be difficult to apply in some cases." 594 U.S. at 429. Few would argue otherwise. But under the path *TransUnion* paved, Barclift's asserted harm (the unauthorized disclosure of private information) bears a close relationship to the harm underlying claims for public disclosure of private facts and breach of confidence. The majority starts down the right road but loses footing on a footnote. I think *TransUnion* is made of sturdier stuff and would not wander further from the limited requirements of Article III. Barclift has shown standing sufficient for a federal court to hear her claim, and so I respectfully concur in part, dissent in part, and dissent in the judgment.